[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 218 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 219 
Wayne E. Terrell purchased a dump trailer from R A Manufacturing Partners, Ltd. ("RAM"), a trailer manufacturer located in Houston, Texas. Terrell ordered the dump trailer from Mike Musselman,[1] a RAM salesman located in Atlanta, Georgia. Musselman had previously worked as a salesman for Travis Body and Trailer, Inc. ("Travis"), and Terrell had previously ordered a Travis dump trailer from Musselman when he was employed by Travis. Terrell and Musselman discussed the options Terrell wanted on his RAM trailer; Terrell stated that he wanted the trailer to be identical to the one he had purchased through Musselman from Travis. Musselman prepared a specification sheet listing, from memory, the options that Terrell had requested on the Travis trailer; however, Musselman had forgotten, and did not recall Terrell's reminding him, that the dump trailer Terrell had ordered from Travis had dual controls.
The specifications for the trailer RAM manufactured for Terrell did not include dual controls. The specifications did provide that the trailer be a 2000 model. Although Musselman recalled sending a copy of the specification sheet to Terrell, Terrell testified that he had never seen a specification sheet.
The dump trailer was manufactured in mid-June 1999. It was manufactured as a 1999 model. The vehicle identification number ("VIN"), the serial plate, and the certificate of origin reflected that the trailer was a 1999 model. According to the testimony of the corporate representatives, Allen Pate and Ronald West, trailers manufactured during the latter half of June could be manufactured as either 1999 or 2000 models, depending on the wish of the customer. The body style of a 1999 model trailer does not differ in any respect from the body style of a 2000 model trailer.
When Terrell received the trailer on June 26, he immediately noticed that it did not contain the dual controls he had on his Travis trailer. In addition, as he was inspecting and testing the trailer, a bracket used to connect the trailer to a truck broke. Terrell communicated these problems to Musselman, who informed Terrell that he should have the bracket repaired at RAM's expense and that he would check on the possibility of having the dual controls installed.
Terrell had the bracket repaired at a cost of $175. He testified that he sent a copy of the bill to RAM. RAM contends that it reimbursed Terrell, while Terrell insists that RAM never reimbursed him.
When Terrell's wife attempted to purchase a tag for the trailer, she was told that she would not be issued a tag because "the paperwork"[2]
reflected that the trailer was a 2000 model while the VIN reflected that it was 1999 model. Again, Terrell communicated the problem to Musselman. Musselman informed Ronald West, who attempted to solve the problem by reissuing the certificate of origin and issuing a new serial plate. The new certificate of origin continued to reflect the same VIN, which indicated that the trailer was a 1999 model, while the new serial plate reflected a different VIN, which also indicated that the trailer was a 1999 model, but which *Page 221 
had been corrected to reflect the actual length of the trailer.[3]
Terrell noticed other problems with the trailer. His driver reported that the side lights sometimes failed to work, so Terrell examined the truck, found a loose connector, and plugged the connector in firmly. Since that time, the lights have worked properly. The driver also reported that the antilock-braking system ("ABS") fault light would come on at times, indicating that the system was not working properly. Terrell did not have the braking system examined. Finally, Terrell noticed what was in his opinion unusual wear on the tires of the trailer. He surmised that the trailer was misaligned, and he had the trailer realigned, which corrected the problem. He did not inform RAM that he had the trailer realigned, nor did he send the bill for the realignment to RAM for payment.
Terrell communicated most of the problems with the trailer to Musselman, who attempted to make suitable arrangements to have the trailer inspected or repaired. Although the specifications for the trailer had not included dual controls, Musselman wanted to make Terrell happy with his purchase. He requested that RAM, at no cost to Terrell, provide the dual controls. Musselman then arranged for the dual controls to be installed at Alabama Trailer Sales in Birmingham; however, this particular shop could not perform the work, and Terrell had to take the trailer to Trailer Service, located in Montgomery, to have the controls installed. Even though the dual controls were installed, Terrell insists that they do not work properly. Despite Musselman's request, Terrell refused to return the trailer to the shop that installed the controls, saying that the mechanics had told him they had done all they could do to the trailer.
Terrell sued RAM, alleging that it had breached express and implied warranties,[4] that it had negligently and/or wantonly manufactured the trailer, and that it had committed fraud. RAM counterclaimed for attorney fees, pursuant to the sales contract. RAM then moved for a summary judgment, which the trial court granted; because RAM's counterclaim remained pending, the trial court made the summary judgment final, pursuant to Rule 54(b), Ala.R.Civ.P. Terrell appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala. Code 1975, § 12-2-7(6).
We review a summary judgment de novo; we apply the same standard the trial court applied. A party moving for a *Page 222 
summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P.; see Lee v.City of Gadsden, 592 So.2d 1036, 1038 (Ala. 1992) (footnote omitted). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Westv. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989); see Ala. Code 1975, § 12-21-12(d). See Ex parte General MotorsCorp., 769 So.2d 903 (Ala. 1999); West, 547 So.2d at 871; and Bass v.SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala. 1989), for further discussion of the application of the summary-judgment standard.
 I. Breach of Express Warranties
Terrell argues that RAM breached its express warranties[5] that the trailer would be a 2000 model, that it would have dual controls, and that it would be free from defects in material and workmanship. RAM did not submit a brief on appeal, but argued in its motion for summary judgment that it had complied with its warranty whenever possible by repairing defects or by providing replacement parts. RAM also argued that Terrell, by refusing to return the trailer to the factory or to an authorized repair facility, had failed to comply with the terms of the warranty. To determine whether the summary judgment was properly entered, we will examine each alleged breach separately.
RAM's warranty provides:
 "(1) RAM Trailers warrants each new trailer or body manufactured to be free from defects in material or workmanship, provided that the equipment warranted hereunder is operated by the purchaser in accordance with generally approved practices, with loads not exceeding the manufacturer's rated capacity and with loads that are not abrasive or corrosive in nature.
 "(2) Any parts of the equipment found to be defective within the warranty period shall be repaired or replaced (at RAM's option), on the pro-rata basis set forth below, at RAM's factory location or authorized service facility, provided, however, the purchaser notifies RAM or an authorized distributor as soon as any defect becomes apparent. The period of the warranty is for five (5) years from the date of delivery of the equipment . . . .
". . . .
 "(4) The purchaser agrees to return the defective equipment or parts to RAM's factory location or authorized service facility, freight prepaid, within 10 days after the defective condition is discovered.
". . . . *Page 223 
 "(6) The sole liability of RAM and the exclusive remedy of the purchaser arising out of the manufacture, sale, or use of the equipment provided hereunder shall be limited to the cost or repair or replacement of defective parts as herein specified. Further, RAM's maximum liability hereunder arising from any cause whatsoever, including but not limited to, breach of contract or tort (including negligence), shall not exceed the contract price of the equipment furnished hereunder. Further RAM shall not be responsible for work done, equipment or parts furnished or parts or repairs made by others unless the work is specifically ordered by RAM for the fulfillment of this warranty. In no event shall RAM be liable for removing defective parts or for reinstalling said parts when repaired or replaced by anyone other than RAM or an authorized service facility or for any costs incurred with such removal or reinstallation.
 "(7) RAM AND THE PURCHASER AGREE THAT, IN CONSIDERATION OF THE ABOVE EXPRESSED WARRANTY ALL OTHER WARRANTIES OTHER THAN TITLE, EITHER EXPRESSED OR IMPLIED, WHETHER ARISING UNDER LAW OR EQUITY INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE EXCLUDED FROM THIS CONTRACT. THE FOREGOING WARRANTY IS MADE SOLELY TO THE FIRST PURCHASER/USER FROM RAM TRAILERS.
 "(8) CONSEQUENTIAL DAMAGES: Notwithstanding any other provisions of this agreement, in no event shall RAM Trailers be liable, whether arising under contract, tort (including negligence) or otherwise, for loss of anticipated profits, damage to the load or contents of the equipment, transportation expenses due to repairs, nonoperation or increased expenses of operation, cost of purchased or replacement equipment, claims of customers, cost of money, loss of user capital or revenue, or for any special, incidental, or consequential loss or damage of any nature arising at any time or from any cause whatsoever."
RAM, in most instances, specifically relies on Terrell's failure to comply with paragraph 4, which required him either to return the trailer to the factory or to take the trailer to an authorized service facility for repair.
In its motion for a summary judgment, RAM also argued that the warranty disclaimers in paragraph 7 entitled it to a summary judgment on several of Terrell's express-warranty claims and on his implied-warranty claims. Such disclaimers are permitted by Ala. Code 1975, § 7-2-316, which requires disclaimers to be conspicuous in order to be valid.
Terrell argues that the disclaimers in RAM's warranty are ineffective because the warranty was not delivered to him until approximately four days after delivery of the trailer. In Tiger Motor Co. v. McMurtry,284 Ala. 283, 290, 224 So.2d 638, 644 (1969), the court determined that a similar disclaimer did not serve to defeat an express warranty because the warranty disclaimer was not called to the attention of the buyer. Similarly, the United States Court of Appeals for the Eleventh Circuit, after considering McMurtry and § 7-2-316, has determined that, under Alabama *Page 224 
law, post-sale disclaimers are not effective because such disclaimers did not form the basis of the bargain. See Bowdoin v. Showell Growers, Inc.,817 F.2d 1543, 1545-46 (11th Cir. 1987). As the federal court explained, even properly conspicuous warranty disclaimers are not effective if they are delivered to the consumer post-sale because "[b]y definition, a post-sale disclaimer is not conspicuous in the full sense of that term because the reasonable person against whom it is intended to operate could not have noticed it before the consummation of the transaction."Bowdoin, 817 F.2d at 1547 (footnote omitted). We conclude, based onMcMurtry and Bowdoin, that the disclaimers contained in RAM's warranty are ineffective because the warranty disclaimers were not made a basis of the bargain.
RAM also argues that it is entitled to a summary judgment on Terrell's express-and implied-warranty claims because paragraph 8 of the warranty limits damages for breach of warranty to only repair or replacement of parts. Such a limitation of remedies is permitted by Ala. Code 1975, § 7-2-719. That section reads:
 "(1) Subject to the provisions of subsections (2) and (3) of this section and of Section 7-2-718 on liquidation and limitation of damages:
 "(a) The agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
 "(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
 "(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
 "(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.
 "(4) Nothing in this section or in Section 7-2-718 shall be construed so as to limit the seller's liability for damages for injury to the person in the case of consumer goods."
Although § 7-2-719 permits limitation of remedies by a seller, we conclude that the limitation of remedies contained in paragraph 8 is ineffective because it, like the warranty disclaimers, was not made a basis of the bargain. See McMurtry, 284 Ala. at 290, 224 So.2d at 644;Bowdoin, 817 F.2d at 1545-46; accord Duffin v. Idaho Crop ImprovementAss'n, 126 Idaho 1002, 1012, 895 P.2d 1195, 1205 (1995) ("It is fundamental that to be effective, disclaimers of warranties and remedy limitations must be part of the bargain struck by the parties."); seealso Adams v. American Cyanamid Co., Neb. Ct. App. 337, 354,498 N.W.2d 577, 588 (1992) (holding that "in order for a limitation of remedy to be effective, it must . . . be conspicuous and a buyer must be afforded a reasonable opportunity to read it"); Antz v. GAF MaterialsCorp., 719 A.2d 758, 761-62 (Pa.Super. 1998) (holding that limitations of remedies provisions were unconscionable because the buyer was not provided the provisions at the time of purchase and delivery); StaufferChemical Co. v. Curry, 778 P.2d 1083, 1093 (Wyo. 1989) ("[A] limitation of liability statement, like a disclaimer of an implied warranty, must be *Page 225 
conspicuous in order to become a basis for the bargain.").
A. Dual Controls
Terrell complains that RAM warranted that the trailer would have dual controls and that it breached that express warranty. The evidence indicates that Musselman never included dual controls in the specifications for Terrell's trailer. However, RAM attempted to remedy Terrell's dissatisfaction by sending him the controls and instructing him to have them installed at RAM's expense. Although the first installer Terrell took the trailer to, Alabama Trailer Sales in Birmingham, determined that it could not install the controls, the controls were installed by Trailer Service in Montgomery. After the controls were installed, Terrell complained that they did not work properly. Specifically, Terrell explained in his deposition that, after the controls were installed, the "tailgate won't open with the air bags." However, Terrell refused to return the trailer to Trailer Service, stating that the employees at Trailer Service had said they had done all they could do to the trailer.
RAM argues that it was not given an opportunity to remedy any problems allegedly caused by the installation of the controls because Terrell refused to return the trailer to Trailer Services, another authorized repair facility, or to the factory. We agree. Terrell's refusal to return the trailer to an authorized repair facility prevented RAM from remedying any defect caused by the installation of the dual controls. Although a seller is not to be given an unlimited time to remedy defects in a product, see Tiger Motor Co. v. McMurtry, 284 Ala. 283, 290, 224 So.2d 638,644 (1969), the problem with the tailgate arose after the installation of the dual controls, and RAM was never given an opportunity to diagnose, much less to repair, that problem. Under the terms of the warranty, RAM should have been given an opportunity to repair. The summary judgment on the breach-of-warranty claim, insofar as it relates to defects with, or caused by, the installation of the dual controls, is affirmed.
B. Defects in Material and Workmanship
Terrell argues that RAM warranted that the trailer would be free from defects in material and workmanship and that it breached that express warranty. Specifically, Terrell complains of defects in (1) the bracket lift, (2)the side lights, (3) the alignment, and (4)the ABS. We will discuss each defect separately.
1. Bracket Lift
Terrell complains that RAM breached its express warranty because the bracket lift broke on the day of delivery and because RAM failed to reimburse Terrell for the expenses he incurred in having the bracket repaired. RAM contends that Terrell failed to return the bracket lift either to the factory or to an authorized service facility for repair as required under paragraph 4 of the warranty and also contends that it in fact reimbursed Terrell for the expenses he incurred.
Although Terrell testified that he telephoned the welder who repaired the bracket lift, Musselman testified that he telephoned the welder and instructed Terrell to have the bracket repaired at RAM's expense. If indeed Musselman authorized the repair by the welder as he testified, it would appear that Terrell complied with the warranty and used an "authorized service facility." In any event, a question of fact concerning whether Terrell used an authorized service facility exists, precluding summary judgment on that basis. The conflicting testimony concerning whether RAM actually reimbursed Terrell prevents a summary judgment on that particular *Page 226 
basis as well. The summary judgment on the express-warranty claim, insofar as it pertains to the repair of the bracket lift, is reversed.
2. Side Lights
Terrell argues that the side lights on the trailer were defective. He testified that the lights appeared to be working upon delivery, but that after about the first or second week his driver reported that the lights worked only some of the time. Terrell inspected the connectors under the trailer and found a loose connector. Once he firmly plugged in the connector, the lights worked properly. He has reported no other problems with the lights since that time.
RAM argues that because the lights work, the lights are no longer defective and the warranty cannot have been breached. We agree. The loose connector, repaired easily and at no cost by Terrell, poses no continuing problem. The summary judgment on Terrell's express-warranty claim, insofar as it pertains to the specific complaints concerning the side lights, is affirmed.
3. Antilock-Braking System
Terrell also complains that the ABS is defective. He testified that about one week after delivery his driver reported that the ABS fault light would occasionally come on, indicating a problem with the ABS, and that the "tires would sometimes slide if you got on them a little bit hard." He testified that he reported the problem to Musselman about two or three weeks later. He said he was not told where to take the trailer to have the ABS examined. He has not undertaken to have them examined at his own expense.
RAM contends that it requested that Terrell take the trailer to Gulf City Body and Trailer in Mobile for inspection of the ABS and other problems. Terrell recalls being told to take the trailer to Gulf City "much later" in reference to the several problems he reported over a period of time. He refused to take the trailer to Gulf City, citing as a reason RAM's refusal to agree to pay to replace tires he said were excessively worn because of the alleged alignment problem. RAM argues that Terrell cannot prove that there is a "problem" with the ABS and that Terrell failed to comply with paragraph 4 of the warranty because he refused to take the trailer to Gulf City for inspection.
After Terrell complained about the brakes, he says he was not told where to take the trailer until "much later." Because the record is not clear as to the dates of many of the communications between Musselman and Terrell concerning where and when to have inspection and/or repair work done, we conclude that there are disputed issues of material fact concerning whether RAM breached its warranty by failing to repair the problem within a reasonable time. See Ag-Chem Equip. Co. v. LimestoneFarmers Coop., Inc., 567 So.2d 250, 252 (Ala. 1990). Accordingly, we must reverse the summary judgment as to the express-warranty claim insofar as it pertains to the ABS, as well.
4. Alignment
Terrell contends that the trailer was out of alignment and that that misalignment breached the express warranty that the trailer be free from defects in workmanship. According to Terrell, the alignment problem manifested itself "maybe 15,000 miles down the road," which was approximately five to seven weeks after delivery. He noticed excessive wear on the outside of the tires, which he said indicated misalignment. Terrell admitted that he was instructed to take the trailer to Gulf City Body Trailer in Mobile for inspection and repair, but that he refused to do so because RAM would *Page 227 
not agree to replace the tires on the trailer. Terrell did, however, have the trailer realigned at Southern Frame Alignment; he never submitted a bill to RAM for that alignment.
RAM never conceded that the trailer was misaligned at the time of delivery; in fact, RAM contended that the alignment problem was likely a later-occurring problem resulting from normal use. RAM also argued that Terrell failed to comply with paragraph 4 of the warranty because he refused to take the trailer to Gulf City as requested. We agree with RAM that Terrell's failure to take the trailer to Gulf City, an authorized service facility, resulted in his breaching the requirements of the warranty. Accordingly, the summary judgment, insofar as it relates to the express-warranty claim based on the alignment of the trailer, is affirmed.
C. Model Year
Terrell argues that RAM breached an express warranty that the trailer would be a 2000 model. An affirmation that an item is of a particular model year has been determined to be an express warranty. Kilborn v.Henderson, 37 Ala. App. 173, 65 So.2d 533 (1953). Musselman admits that Terrell requested a 2000 model trailer and that he informed Terrell that the trailer would be a 2000 model. The trailer, as delivered, bore indications in the VIN, on the serial plate, and on the certificate of origin that it was a 1999 model. RAM attempted to remedy the problem by reissuing a serial plate and a certificate of origin; however, the VIN on the new serial plate still indicated that the trailer was a 1999 model and, by having Terrell remove the old serial plate and affix the new plate, RAM induced Terrell to possibly commit a crime.[6] See Ala. Code 1975, § 32-8-86(a) (making it a Class A misdemeanor to remove or falsify the identification number of a vehicle); Ala. Code 1975, §13A-8-22 (making it a Class C felony to obscure the identity of a vehicle). Pate admitted that the problem with the VIN and the model year had not yet been corrected in September 2000. He and West also admitted that the difference in model year, although not reflected in the price of the trailer when sold new, would affect the resale value of the trailer.
RAM discovered the appropriate method for changing the VIN number on the trailer after it contacted the Alabama Department of Revenue. It first informed Terrell of the appropriate method in December 2000 at West's deposition; it also filed an affidavit outlining the procedure with its motion for summary judgment. The question remains whether RAM's attempt to remedy the problem properly arrives too late to have seasonably cured the defect in the trailer. As mentioned earlier, a seller does not have an unlimited time in which to correct defects in its products. See McMurtry, 284 Ala. at 290, 224 So.2d at 644. Terrell reported the problem with the model year within days of delivery of the trailer on June 26, 1999. We conclude that RAM's December 2000 attempt to advise Terrell of the proper remedy comes too late. Accordingly, the summary judgment on the express-warranty claim, insofar as it relates to the model year, is reversed.
 II. Implied Warranty of Merchantability
Terrell argues that RAM also breached the implied warranty of *Page 228 
merchantability because, he argues, the trailer, as sold, would not pass without objection in the trade and was not fit for the ordinary purpose for which it was intended to be used. RAM argued that the implied warranties were disclaimed by conspicuous language in its written warranty. However, as was discussed previously, the disclaimers were ineffective because Terrell received the warranty several days after delivery of the trailer. See McMurtry, 284 Ala. at 290,224 So.2d at 644.
The implied warranty of merchantability is found in Ala. Code 1975, § 7-2-314, which reads, in pertinent part:
 "(1) Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
"(2) Goods to be merchantable must be at least such as:
 "(a) Pass without objection in the trade under the contract description; and
 "(b) In the case of fungible goods, are of fair average quality within the description; and
 "(c) Are fit for the ordinary purposes for which such goods are used; and
 "(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
 "(e) Are adequately contained, packaged, and labeled as the agreement may require; and
 "(f) Conform to the promises or affirmations of fact made on the container or label if any."
 "`In an action for breach of an implied warranty, the plaintiff must prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'" Barrington Corp. v. Patrick Lumber Co., 447 So.2d 785, 787
(Ala.Civ.App. 1984) (quoting Storey v. Day Heating Air Conditioning Co., 56 Ala. App. 81, 83, 319 So.2d 279, 280 (1975)). Terrell argues that he presented substantial evidence indicating that the trailer would not pass without objection in the trade and that it was not fit for the ordinary purposes for which it was intended to be used. Thus, he contends, the summary judgment on his implied-warranty claim was improper.
Terrell's argument that the trailer, because of the discrepancy in the model year, would not pass without objection in the trade is convincing. Pate testified that he would likely be dissatisfied with a 1999 model trailer if he had ordered a 2000 model trailer, and both he and West acknowledged that the resale value of the trailer would be affected by the model year. Terrell also produced evidence indicating that the discrepancy between the VIN on the undercarriage of the trailer and the VIN on the serial plate poses potential problems in resale and may result in criminal sanctions if the fact was discovered by authorities.[7] We conclude that whether the trailer would pass without objection in the trade, and thus whether the implied warranty of merchantability was breached, remains a question for a fact-finder to determine and therefore that the summary judgment on that issue should be reversed. *Page 229 
As discussed above, Terrell had several complaints concerning the trailer. He had a problem with the brackets, the side lights, the ABS, and the alignment. He has also had problems related to the installation of the dual controls he requested. He contends that these "defects" prevent the trailer from being merchantable because some pose a safety hazard. However, we are of the opinion that the fact that the trailer, while not in perfect condition, has been used in Terrell's business since its delivery (except for those dates on which it was being repaired or serviced) precludes Terrell's argument that the trailer was not fit to haul loads as a trailer is intended to do. Accordingly, as to that aspect of his implied-warranty claim, we affirm the summary judgment.
 III. Negligent and/or Wanton Manufacture
Terrell argues that the trial court erred by entering a summary judgment in favor of RAM on his negligent-and/or-wanton-manufacture claim. RAM successfully argued in the trial court that Terrell could not allege negligent and/or wanton manufacture because the only damage he suffered was damage to the property itself. See Ex parte Grand Manor,778 So.2d 173, 178 (Ala. 2000). According to Terrell, however, he has suffered emotional distress and, he says, under AALAR, Ltd. v. Francis,716 So.2d 1141 (Ala. 1998), he is entitled to recover from RAM.
According to our supreme court, emotional distress is not recognized as a compensable injury in negligence actions unless the distress results from actual physical injury or from the fear for one's own physical safety. Francis, 716 So.2d at 1148. In Francis, the plaintiffs, F.N. Francis and C.J. Francis, a mother and her son, rented an automobile that, unbeknownst to them, had been registered as a stolen vehicle with the National Crime Information Center ("NCIC"). Francis, 716 So.2d at 1143 C.J. was driving the automobile when he caught the attention of a local police officer. Id. After the police officer learned that the automobile had been reported stolen, he and other officers went to the plaintiffs' home to question C.J. Id. When C.J. went to the automobile to retrieve the rental papers from the glove compartment, one of the officers, unsure of C.J.'s intentions, momentarily pulled his weapon.Id.
The Francis court was faced with the question whether C.J. could recover on his negligence claim against the rental company when he had suffered only emotional distress without accompanying physical injury.Id. at 1144. After examining the pertinent caselaw, the court decided that, because C.J. had been placed in fear of his own physical safety when the police officer drew his weapon and because such a result, i.e., being arrested at gunpoint, could have been reasonably foreseen by the rental company because of its failure to have the recovered rental automobile removed from the NCIC computer file, C.J. could recover for his emotional distress despite the lack of an accompanying physical injury. Id. at 1147. However, F.N. was not entitled to recover for emotional distress because she "was never at risk of suffering physical injury." Id.
Although Terrell argues that, like C.J. in Francis, he could have been subjected to arrest at gunpoint because of the discrepancies in the VINs on the undercarriage of the trailer and the serial plate, he was not actually arrested and, in fact, did not testify that he feared for his physical safety when he was questioned about emotional distress. His situation is more akin to F.N.'s in that, like F.N., he may have been a "foreseeable plaintiff with a legally protected interest and, thus, was owed a duty by [RAM] to exercise due care." Id. at *Page 230 
1148. Like F.N., however, the fact that he may have been a foreseeable plaintiff does not entitle him to recovery of damages for emotional distress from RAM. See Id. Accordingly, the summary judgment, insofar as it relates to Terrell's negligent-and/or-wanton-manufacture claim, is affirmed.
 IV. Fraud
Terrell also argues that the summary judgment in favor of RAM on his fraud claim should be reversed. Terrell bases his fraud claim on the representation by Musselman that the trailer Terrell ordered would be a 2000 model, on RAM's failure to equip the trailer with dual controls, and on RAM's failure to disclose that the trailer would not live up to its warranty to be free from manufacturing defects. In its motion for a summary judgment, RAM argued that Terrell's fraud claim actually stated apromissory fraud claim because the alleged misrepresentations concerned an act to be performed in the future. We agree.
To prove that RAM, through Musselman, committed promissory fraud, Terrell would have to establish (1) that Musselman made a false representation concerning RAM's intent to perform or abstain from performing in the future, (2) that Musselman intended for RAM not to do the act promised at the time of the alleged misrepresentation, (3) that Musselman intended to deceive him, (4) that he justifiably relied on this alleged misrepresentation, and (5) that he was damaged as a proximate result of that reliance. See Howard v. Wolff Broadcasting Corp.,611 So.2d 307 (Ala. 1992).
Terrell admitted in his deposition that he thought that Musselman intended to sell him a 2000 trailer. Although it is evident from the testimony of Pate and West that they thought they were selling a 1999 trailer, it is equally clear from their testimony that they believed that the 1999 trailer was what was ordered. The evidence also tends to show that Musselman mistakenly failed to request the dual controls and that, upon being informed of the mistake, he immediately arranged to have the controls installed. This evidence is not substantial evidence indicating RAM's intent to deceive Terrell or its intent not to perform as it had promised. Terrell's argument that RAM intended not to manufacture a trailer that was free from defects as stated in it warranty is likewise unsupported by substantial evidence. The summary judgment, insofar as it relates to the promissory-fraud claim, is affirmed.
 V. Conclusion
The summary judgment, insofar as it relates to Terrell's express-warranty claims based upon the defects in the bracket lift, the defects in the ABS, and the discrepancy in the model year, and insofar as it relates to his implied-warranty claim based upon the discrepancy in the model year, is reversed. In all other respects, the summary judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Yates, P.J., and Thompson and Pittman, JJ., concur.
[1] Allen Pate, one of RAM's corporate representatives, testified that RAM stood behind Musselman's actions. No issue of agency is raised by the parties.
[2] We are uncertain exactly what "paperwork" Mrs. Terrell had that indicated that the trailer was a 2000 model, but we surmise that the loan documents, which did contain that information, were presented to the vehicle-registration office.
[3] The copy in the record of the second serial plate is illegible. However, upon request, the circuit clerk compared the two exhibits and reported that they reflect identical numbers. In Ronald West's deposition, he, when viewing a copy of the new serial plate and a copy of the VIN number embossed on the undercarriage of the trailer, stated that the numbers differ in that the seventh digit on the undercarriage VIN is a 6 and the seventh digit on the serial-plate VIN is a 5.
[4] Terrell argues on appeal that the certification on the trailer's serial plate, which reads: "THIS VEHICLE CONFORMS TO ALL APPLICABLE U.S. FEDERAL MOTOR VEHICLE SAFETY STANDARDS IN EFFECT ON THE DATE OF MANUFACTURE SHOWN ABOVE," creates an express warranty that the trailer does conform to federal laws governing the manufacture of trailers and that that warranty was breached because RAM admittedly failed to comply with several of those federal standards. He also argues that the fact that RAM's failure to comply with those federal standards constitutes a breach of the implied warranty of merchantability. However, after reviewing the complaint, we have determined that Terrell did not raise these issues in the trial court. Accordingly, we will not address either argument on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala. 1992).
[5] The creation of express warranties are governed by Ala. Code 1975, § 7-2-313, which reads, in pertinent part, as follows:
 "(1) Express warranties by the seller are created as follows:
 "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
 "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."
[6] Arguably, Terrell could be protected from criminal prosecution under Ala. Code 1975, § 13A-8-22, because his intent in replacing the serial plate was not to obscure the previous VIN. However, Ala. Code 1975, § 32-8-86(a), which makes it a Class A misdemeanor to remove or falsify and identification number, does not appear to require any fraudulent intent.
[7] See note 6, supra.