[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10073
_____

D.C. No. 1:14-cv-00161-JRH-BKE

PATRICIA C. FLOURNOY,

Plaintiff-Appellant,

versus

CML-GA WB, LLC,

Defendant-Cross Claimant-
Cross Defendant-Appellee,

RIALTO CAPITAL ADVISORS, LLC,
PAUL GREGORY KING,

Defendant-Cross Claimant-Appellees,

REX PROPERTY AND LAND, LLC,

Defendant-Cross Defendant-
Cross Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(March 27, 2017)

Before ED CARNES, Chief Judge, ANDERSON, Circuit Judge, and ROSENBERG,[*] District Judge.

ROSENBERG, District Judge:

Plaintiff Patricia Flournoy is an African-American woman who owns and operates a hair salon. Seeking to expand her business, Ms. Flournoy applied to lease space in the JB Whites Building. After her lease application was denied Ms. Flournoy brought suit, alleging that the denial infringed her right to freedom from racial discrimination in the making of a contract. *See* 42 U.S.C. § 1981. The district court granted summary judgment for Defendants, ruling that Ms. Flournoy had not established a *prima facie* case and, alternatively, that she had not rebutted the legitimate, nondiscriminatory reasons Defendants proffered for denying her lease application. Ms. Flournoy appealed. We now affirm on the second of these two grounds.

## I. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo* and apply the same standards that governed the district court. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In determining whether this standard is met, the Court must view the facts in the light most favorable to the non-moving party and draw

---

[*] Honorable Robin L. Rosenberg, United States District Judge for the Southern District of Florida, sitting by designation.

2

all reasonable inferences in that party's favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  Only a genuine and material factual dispute will defeat summary judgment. *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Id.* (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

II. BACKGROUND

Plaintiff Patricia Flournoy has, since about 2007, owned and operated Karisma Hair Studio in Augusta, Georgia. In 2012, desiring to grow her business, Ms. Flournoy began looking for a new location.  During an online search, she came across an advertisement by Defendant Rex Property and Land, LLC ("Rex"). Rex is the real estate management company for Defendant CML-GA WB, LLC ("CML"). CML, a special purpose entity managed by Defendant Rialto Capital Advisors ("Rialto"), owns the JB Whites building in downtown Augusta.

Ms. Flournoy called the telephone number included in Rex's advertisement and spoke with Ms. Andrea Carr, a property manager at Rex. The pair viewed several available properties. But only one—the JB Whites building—piqued Ms. Flournoy's interest. The first floor of JB Whites is commercial space. Fifty-one

3

condominiums occupy the floors above. Ms. Flournoy expressed interest in one of the rear commercial units. Ms. Carr gave Ms. Flournoy a lease application and told her that she would be subjected to a background and credit check.

After meeting with Ms. Carr, Ms. Flournoy received a call from Defendant Paul King. Mr. King, Rex's general manager, is the property manager and sales broker for the JB Whites building.  Mr. King expressed interest in visiting the Karisma Hair Studio and asked a number of questions about Ms. Flournoy's business. After the call, he visited the salon's existing location. Either shortly before or after his visit to Karisma, Mr. King asked whether Ms. Flournoy's salon could service all races and genders. Ms. Flournoy assured him that it could.

Mr. King also discussed Ms. Flournoy's interest in the space with Bradley Kentor, the Vice President of Commercial Real Estate at Rialto. Mr. Kentor told Mr. King early in the application process that a salon was not a preferred tenant because the cost of ventilation to mitigate fumes and odors was potentially prohibitive. It is unclear whether this conversation occurred before or after Mr. King called Ms. Flournoy and visited her salon. Mr. Kentor also had concerns about the historically high failure rate of salons, and the fact that salon visitors were not likely to patronize other commercial spaces during visits to the JB Whites Building.

4

Credit and background checks on Ms. Flournoy were run on August 24, 2012. Ms. Flournoy's credit score was less than 700. According to Ms. Flournoy, Ms. Carr, who had run the checks, told Ms. Flournoy that "everything looked good" and gave her a diagram of the suite so that Ms. Flournoy could indicate where she wanted sinks and other fixtures placed. The rear units were not built out; no plumbing, HVAC, or electrical work was (or is) in place.

Ms. Flournoy later received a call from Ms. Carr. First, Ms. Carr told Ms. Flournoy that Mr. King had indicated a desire for commercial tenants to be able to service "the people upstairs." Ms. Flournoy assured Ms. Carr that she could cut and style all hair types. Ms. Carr also told Ms. Flournoy that Mr. King had requested the submission of a business plan. Ms. Flournoy hired Ms. Catherine Maness to prepare that plan.

Ms. Maness called Ms. Carr to get an address needed to complete the business plan. Ms. Maness testified that Ms. Carr told Ms. Maness during that phone call that Ms. Flournoy's credit score posed a problem. Ms. Maness relayed her conversation with Ms. Carr to Ms. Flournoy, who then called Ms. Carr. Ms. Carr said that she could not remember when she told Ms. Flournoy that Rialto wanted a credit score of at least 700.

Ms. Maness and Ms. Flournoy went to Mr. King's office to deliver the business plan. Ms. Flournoy testified that Mr. King told her during the meeting that

5

she would not be permitted to lease the space because her credit score was too low. According to Mr. King, other reasons were provided as well. Mr. King said that Mr. Kentor had instructed him to implement a minimum credit score requirement. But Mr. Kentor said that he did not recall giving any such instruction. After this meeting, Ms. Flournoy and Defendants stopped communicating about her lease application.

## III. DISCUSSION

42 U.S.C. § 1981 guarantees all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." To sue successfully for non-employment discrimination under § 1981, Ms. Flournoy must show that she is a member of a racial minority, that the discrimination concerned one or more activities enumerated in the statute, and that Defendants intentionally discriminated against her on the basis of her race. *See Kinnon v. Arcoub, Gopman & Assoc. Inc.*, 490 F.3d 886, 889-91 (11th Cir. 2007) (citing *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).

It is undisputed that the first two elements are satisfied. Ms. Flournoy, who is African-American, belongs to a racial minority. And the denial of a lease application plainly concerns the right "to make . . . contracts." 42 U.S.C. § 1981. The issue, therefore, is whether Ms. Flournoy can show that the denial of her application amounted to intentional, race-based discrimination. This showing may

be made using direct or circumstantial evidence. Ms. Flournoy has put forward only the latter.

To determine whether Ms. Flournoy's circumstantial evidence suffices to establish intentional, race-based discrimination, the Court applies the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) (applying this framework in a § 1981 lawsuit). Under the *Douglas/Burdine* framework, plaintiff bears the initial burden of establishing a *prima facie* case, which creates a rebuttable presumption of discriminatory intent. *McDonnell*, 411 U.S. at 802. Defendant must then rebut that presumption by producing evidence of a legitimate, nondiscriminatory reason for its action. *Id.* at 802-03. If defendant bears its burden of production, plaintiff must establish that defendant's proffered reason is but a pretext for unlawful discrimination. *Tex. Dep't.*, 450 U.S. at 256.

The Court now turns to the first part of that thrust and parry: Ms. Flournoy's *prima facie* case. The district court below applied the *prima facie* case articulated in *Benton v. Cousins Properties, Inc.*, 230 F. Supp. 2d 1351 (N.D. Ga. Sept. 27, 2002), *aff'd* 97 Fed. App'x 904 (11th Cir. 2004) (table decision). It requires Ms. Flournoy to show that: she belongs to a racial minority, the discrimination against

her concerned one or more activities enumerated in § 1981, and an apt comparator was not subjected to the same discriminatory treatment. *Id.* at 1370. It is not necessary to address whether the district court applied the correct *prima facie* case or whether it did so properly because, even if Ms. Flournoy has made out her *prima facie* case, she has not created a genuine dispute of material fact regarding the legitimate, nondiscriminatory reasons offered by Defendants.

Assuming *arguendo* that Ms. Flournoy has made out a *prima facie* case, Defendants must rebut the resulting inference of discrimination by articulating legitimate, nondiscriminatory reasons for their action. *Burdine*, 450 U.S. at 254-55. That "exceedingly light" burden is one of production, not persuasion. *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). Here, Defendants shouldered it by articulating, by reference to the record, several legitimate, nondiscriminatory reasons for rejecting Ms. Flournoy's lease application. Among them: odors emanating from the salon would disturb the residential tenants on the upper floors, Ms. Flournoy's business would not survive given the number of other salons in the area, a salon would not generate cross-shopping with other commercial tenants of the JB Whites building, Ms. Flournoy's credit score was too low, and Defendants would not break even given the high cost of building out the unit.

Ms. Flournoy must persuade the Court that Defendants' legitimate, nondiscriminatory reasons are pretexts for discrimination in order to prevail. Because Defendants have "proffer[ed] more than one legitimate, nondiscriminatory reason," Ms. Flournoy "must rebut each of the reasons to survive a motion for summary judgment." *Chapman v. Al. Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (*en banc*). With regard to each reason, Ms. Flournoy must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005).

The Court begins with Ms. Flournoy's focus: the credit score requirement. According to Mr. King, Ms. Flournoy's application was denied partly because her credit score was below 700. A reasonable factfinder could, Ms. Flournoy alleges, reject this explanation given record inconsistencies about the requirement's very existence. Mr. King testified to being instructed to put the credit score requirement in place by Mr. Kentor,[1] who, according to Ms. Flournoy, "denied ever giving King such instruction," Appellant Br. 13. But that was not Mr. Kentor's testimony.

---

[1] " . . . I talked to Bradley Kentor, and he said they wanted—for anybody for those back units, they wanted a credit score of 700 and higher. So that was the first time that has been introduced." 41-5, 52: 18-22; *id.* 56: 19-21 (". . . I can't give a date, but it was Bradley told me on the phone. He said, we want 700 and up . . ."); *id.* 219: 12-18 ("At some point in the process I talked to Bradley and he said he wanted a 700 credit score . . .").

Mr. Kentor stated only that he did not *recall* giving Mr. King any such instruction.[2] This Court is, of course, obligated to view the facts in the light most favorable to Ms. Flournoy and to draw all reasonable inferences in her favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). But the leap between "I do not recall" and "I gave no such instruction" is more than a reasonable inference.

However, Ms. Flournoy also points out that Ms. Ellis—the only other proprietor to pursue a rear commercial unit and a white woman—was not made aware of the credit score requirement until two months into her application process and only *after* Defendants had learned of Ms. Flournoy's lawsuit. Taking this fact and Mr. Kentor's inability to recall ever instructing King to implement a credit score requirement in the light most favorable to Ms. Flournoy, the issue of whether a reasonable factfinder could reject the explanation that Ms. Flournoy's lease application was denied on account of her credit score becomes closer. But even assuming that Ms. Flournoy has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder could find the credit score explanation "unworthy of credence," she still would not prevail. *Vessels*, 408 F.3d at 771.

---

[2] "Q: So there is no requirement that a commercial tenant have a minimum credit score of at least 700? A: Not that I recall ever having that discussion, no." 41-4, 31-32: 22-1; *id.* at 36-37: 22-3 (Q: During Mr. King's deposition, I'm pretty sure he said that you told him that there would be a minimum credit score requirement of 700 for the rear commercial spaces in the JB Whites Building . . . A: I don't recall ever instructing him to do that.").

10

True, "[i]n appropriate circumstances, the trier of fact can infer from the falsity of the explanation that the [defendant] is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). But Ms. Flournoy's reliance on that principle is misplaced. More than one legitimate, non-discriminatory reason has been presented in this case. We reject the argument that the jury, having concluded that King manufactured the credit score requirement, "could also reasonably disbelieve all of the other alleged non-discriminatory reasons offered . . ." Appellant Br. 11. It is the law of this Circuit that where a defendant "proffers more than one legitimate, nondiscriminatory reason," plaintiff "must rebut each of the reasons to survive a motion for summary judgment." *Chapman v. Al. Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (*en banc*). Here, several other legitimate, nondiscriminatory reasons presented by Defendants have not been rebutted by Ms. Flournoy. She cannot, therefore, survive summary judgment.

Defendants offered fear that odors from the salon would disturb the residential tenants who lived above the commercial units as an explanation for denying Ms. Flournoy's lease. Indeed, Defendants had experience with odors wafting upward from a restaurant occupying a commercial unit in the building. Ms. Flournoy has not rebutted this proffered reason. She asserts that there are "additional inconsistencies" regarding odors. Appellant Br. 18-19. Specifically, she

11

notes disagreement about whether Mr. King and Mr. Kentor discussed odors over the phone or in-person and disagreement about whether concern about odors was ever relayed to Ms. Flournoy and Ms. Maness. These inconsistencies exist. But neither could render the Defendants' explanation "unworthy of credence." *Vessels*, 408 F.3d at 771. Regardless of where the discussion took place, there is no question that Mr. Kentor relayed concern about odors to Mr. King, who saw that concern as meritorious.

Defendants also proffered concern that salon patrons would be unlikely to visit multiple commercial spaces within JB Whites—a phenomenon known in marketing circles as "cross-shopping." The ultimate goal of Defendants' enterprise was selling the building's residential units. Defendants reasoned that commercial tenants likely to generate cross-shopping would best serve that end. The reasoning is that cross-shopping would increase foot traffic which would, in turn, increase sales of residential units.  Mr. Kentor cited data reflecting that salon patrons do not typically cross-shop. Instead, "[t]hey take a parking space and do their service and they leave . . . They don't grab a cup of coffee at Blue Moon and say, hey, I will go look at a model unit . . ." DE 41-4, 107:7-8. Ms. Flournoy emphasizes that although a salon may not have been a preferred use because of concerns about cross-shopping, it was not a prohibited use. Appellant Br. 17. But the fact that this consideration did not compel the denial of her lease is not relevant. It is a sensible

12

legitimate, nondiscriminatory reason for which Defendants *could* have denied Ms. Flournoy's lease application. That is enough.

## IV. CONCLUSION

Because Ms. Flournoy has failed to create a genuine issue of material fact regarding some of the legitimate, nondiscriminatory reasons that Defendants provided for denying her lease application, the decision of the district court is

AFFIRMED.