[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12914
Non-Argument Calendar

_____

D.C. Docket No. 2:14-cv-02353-JEO

JERRY W. EASTERLING,

Plaintiff - Appellant,

versus

FORD MOTOR COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 5, 2019)

Before TJOFLAT, WILSON, and HULL, Circuit Judges.

PER CURIAM:

In 2012, Jerry Easterling was driving his 2003 Ford pickup truck, which he had purchased used in 2007, when he hit a patch of ice. He claims that his seatbelt, which he was wearing, came undone during the crash sequence. As a result of the accident, he suffered serious injuries and sued Ford for breach of an implied warranty of merchantability.

This case requires us to answer two straightforward questions. First, what is the legal standard under Alabama law for breach of an implied warranty of merchantability? And second, does the summary-judgment record before us contain sufficient admissible evidence of breach?

We vacate the District Court's order granting summary judgment for Ford because the record contains sufficient admissible evidence to raise a genuine question of fact on whether Ford breached the warranty. Because we write for the parties, we set out facts only as they are needed to support our analysis.

## I.

We review *de novo* a district court's grant of summary judgment. *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1337 (11th Cir. 2017). We "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Id.* The movant must show that the record contains "no genuine dispute as to any material fact." *Id.* (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine if "a reasonable trier of fact could return judgment for

2

the non-moving party." *Id.* (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008)).  A fact is "material" if "it would affect the outcome of the suit under the governing law."  *Id.* (quoting *Miccosukee Tribe of Indians of Fla.*, 516 F.3d at 1243).

## II.

Under Alabama law,[1] proving an implied-warranty-of-merchantability claim requires "the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach."  *Bagley v. Mazda Motor Corp.*, 864 So. 2d 301, 315 (Ala. 2003) (quoting *Barrington Corp. v. Patrick Lumber Co.*, 447 So. 2d 785, 787 (Ala. Civ. App. 1984)).

The question before us is the legal standard under Alabama law for "breach" of the implied warranty.

The statute provides a ready answer: The warranty, among other things, is that goods "[a]re fit for the ordinary purposes for which such goods are used." Ala. Code § 7-2-314.  So naturally, breach occurs when goods are *not* fit for the ordinary purposes for which they are used.  It's that simple.  Indeed, a civil jury in

---

[1]    Easterling invoked the District Court's diversity jurisdiction, which requires us to apply Alabama substantive law.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938). In determining the contents of Alabama law, decisions of the Supreme Court of Alabama and the Alabama Court of Civil Appeals control.  *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) ("[F]ederal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise." (quoting *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 158, 68 S. Ct. 488, 491 (1948))).

Alabama is instructed on the law with this exact language. *See* 2 *Alabama Pattern Jury Instructions: Civil* 32.21 (rev. 3d ed. 2018), Westlaw (database updated Dec. 2018) ("The (name of product) was not suitable or fit for the ordinary purpose for which (type of product) is used.").

Ford argues that to prove breach of the warranty, a plaintiff must prove that that the good was "defective" and that the unfit condition existed "at the time of sale." We address each concern in turn.

On the one hand, it is difficult to speak of a good that is "unfit" without explaining why it is in some way "defective." Indeed, the commentary to § 7-2-314 states that "[a]ction by the buyer following an examination of the goods which ought to have indicated the *defect complained of* can be shown as matter bearing on whether the breach itself was the cause of the injury." Ala. Code § 7-2-314 official cmt. (Purposes of Changes) (emphasis added).

On the other hand, defectiveness and unfitness are two distinct concepts under Alabama law. In *Ex parte Gen. Motors Corp.*, 769 So. 2d 903 (Ala. 1999), the Supreme Court of Alabama reaffirmed a "clear distinction" between product liability and warranty liability under Alabama law. *Id.* at 913. To prevail on a product-liability claim, a plaintiff must prove that a product suffered from some "defect." *Id.* at 912. The court explained that "defect" under Alabama law is a hybrid of two concepts—fitness for the ordinary purpose (derived from warranty

4

law) and unreasonable dangerousness (derived from product-liability law). *Id.* at 912−13. Because "defect" is a term of art that was hatched in the context of product-liability law, it stands to reason that "defect" is not an element of an implied-warranty claim, especially since "defect" appears nowhere in the text of § 7-2-314. *Cf. Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016) ("We construe the statute's silence as exactly that: silence." (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) (alteration adopted))).[2]

Suffice it to say that although an implied-warranty plaintiff must prove a "defect" in the colloquial sense of the word, the legislature has chosen specific language that establishes the warranty—and "defect" is not part of that language. The District Court's task on Ford's motion for summary judgment was to evaluate whether the record contains sufficient admissible evidence that the seatbelt at issue was not "fit for the ordinary purposes for which [seatbelts] are used." *See* Ala. Code § 7-2-314.

---

[2] The Supreme Court of Alabama has indicated that defectiveness and unfitness "go hand-in-hand," *Ex parte Morrison's Cafeteria of Montgomery, Inc.*, 431 So. 2d 975, 977 (Ala. 1983), but has done so only in cases involving food products. *See id.*; *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1068 (Ala. 1993). We have no reason to believe that the rationale extends beyond that context.

Before we assess the District Court's performance of that task, however, we address whether breach of the warranty must be evaluated, as Ford argues, "at the time of sale."

Section 7-2-314 does not allow a plaintiff to prevail on his claim by simply submitting evidence of a broken good. By the statute's plain text, a broken good does not generate liability when (1) damage resulted either from non-ordinary use or when (2) even if the use was ordinary, nothing about the good was unfit. And just because some good breaks at some time and place does not mean it is unfit. *Cf., e.g.*, *Wetzel v. Bingman Labs., Inc.*, 104 So. 2d 452, 453 (Ala. Ct. App. 1958) (characterizing merchantability as "quality of inherent soundness sometimes described as a little above the level of mediocrity, sometimes as being of a middling grade, and in other cases as of being of average suitability to the market").

For this reason, the statute requires a factfinder (or a court on summary judgment) to account not just for uses to which a good has been put, but also for its age and wear and tear. *See, e.g.*, *DaimlerChrysler Corp. v. Morrow*, 895 So. 2d 861, 864−65 (Ala. 2004) (framing the inquiry as whether a pickup truck was "not fit for the ordinary purposes for which such trucks are used" when "bucking and jerking" occurred only intermittently, only when the plaintiff was pulling his longest trailer at 55 miles per hour and when the truck had been driven 248,000

6

miles by the time of trial); *Bagley*, 864 So. 2d at 315 (framing the inquiry as whether a car was "fit for its ordinary purpose and therefore merchantable" when a wheel came off of a roughly ten-year old car while it was being driven); *Terrell v. R & A Mfg. Partners, Ltd.*, 835 So. 2d 216, 229 (Ala. Civ. App. 2002) (framing the inquiry as whether a trailer was "not fit to haul loads as a trailer is intended to do" when, despite problems with brackets, side lights, the antilock braking system, and the alignment, the plaintiff had successfully used the trailer except on some days on which it was being serviced).

To Ford's point, these cases reveal that even if breach is assessed at the time of sale, the inquiry is forward-looking in nature. A good is unfit if it lacks a level of hardiness and resistance to wear and tear, such that normal use will not cause sudden and catastrophic failure. Just as the District Court was required to account for the fact that the seatbelt was ten years old, it was required to analyze what a ten-year-old seatbelt should be able to withstand.

Having explained what proof of breach requires, we now turn to the record before us.

### III.

Whether summary judgment is appropriate, insofar as what inferences a factfinder may draw, is a matter of federal law. *See Hull v. Merck & Co.*, 758 F.2d 1474, 1476 (11th Cir. 1985) ("The quantity and quality of proof necessary to make

7

out a case for submission to a jury in a federal court are determined by federal law." (alteration adopted) (quoting *Johnson v. Buckley*, 317 F.2d 644, 646 (5th Cir. 1963))).  Federal law "allows the jury to choose among reasonable inferences in a case based on circumstantial evidence."  *Fid. & Deposit Co. of Md. v. S. Utilities, Inc.*, 726 F.2d 692, 694 (11th Cir. 1984).

The record here contains sufficient admissible evidence of breach.  We begin our analysis by reviewing the material facts.

To operate a seatbelt, the user inserts the latch plate into the buckle, and as he does so, the button is gradually depressed.  When the latch plate reaches the correct position, a spring-loaded lock bar within the buckle locks the latch plate into place.  At the same time, return springs force the button back to its home position.  When the latch plate is properly inserted, the buckle makes an audible "click" sound.  To undo the buckle, the user depresses the button.  As he does so, ramps molded onto the button gradually push the lock bar away from the latch plate.  At the proper point of depression, the spring ejects the latch plate from the buckle.  A correctly functioning seatbelt will thus (1) hold the latch plate in place until the user depresses the button to release it and (2) provide an audible "click" when (and only when) it is correctly latched.

Easterling retained an expert, Eric Lee Van Iderstine, to examine the subject seatbelt.  Over the course of his mechanical-engineering career, Van Iderstine has

designed equipment for the manufacture, assembly, and testing of automotive components, including those used by Ford. Van Iderstine performed a computerized tomography ("CT") scan of the subject buckle.

The scan revealed that the pair of return springs—those that force the button back to its home position—were broken, out of position, and not in contact with the intended part of the button. Taking measurements, Van Iderstine determined that the button was 1.72 millimeters below its home position. That is, its natural resting place at the time of measurement was recessed from the top of the buckle, where it should have been. Ford's seatbelt expert, Eddie Cooper, agreed that the springs were broken and that the button was recessed from its home position. Van Iderstine stated that it would be impossible to know exactly how many millimeters the button was recessed on the day of the accident—"whether 1.9 or 1.7, 2.9, 2.5."

The testing protocol that Van Iderstine employed directed him to test manual removal of the latch plate (that is, removal without depressing the button) at a recessed distance of 2.9 millimeters. At this distance, he was able to remove the latch plate from the buckle after finessing it back and forth three or four times with his hands. Based on these test results, he stated that with enough lateral load—i.e., in a forceful crash—the latch plate might be unintentionally ejected from the buckle even at a recessed distance of 1.72 millimeters.

9

Before the accident, Easterling would sometimes insert the latch plate into the buckle but not hear a click. On those occasions, he would reinsert the buckle until he heard a click. This click, Van Iderstine stated, would occur even though the button was recessed, thus giving Easterling the (incorrect) feedback that the mechanism was functioning properly.

So is there sufficient evidence for a factfinder to determine that Easterling's seatbelt was not "fit" for its ordinary intended use of passenger restraint? Absolutely—on two fronts. First, everyone agrees on the key fact: The pair of guide springs was broken, thus causing the button to return somewhere short of its intended home position. In Van Iderstine's words, "The—the button on the subject buckle was—without a latch plate in place, was in a depressed condition that should not be the case if the buckle is—is functioning properly." As such, he said, the buckle was in a "compromised condition." Second, the mechanism not only failed to notify Easterling that it was compromised; it misled him into thinking it was functioning properly by providing a "click."

The most significant fact that Ford takes grievance with is the age of the seatbelt. But when all parties agree that the pair of guide springs was broken, and thus that the button was compromised, when the button would erroneously lead a user to believe that the mechanism was functioning properly, and when Ford's own expert observed wear and tear "typical of normal use"—a factfinder must be

10

allowed to apply the statutory standard to the facts of Easterling's claim. The record contains no evidence, moreover, that Easterling used the seatbelt for some ill-purpose—say storing loose change or stashing chewing gum in the buckle slot. A body of "reasonable and fair-minded men" could determine that a seatbelt in a car purchased today should not unexpectedly come undone in an accident ten years later due simply to wear and tear. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc)).

Ford also flags Van Iderstine's test, emphasizing that he tested removal of the latch plate only at a recessed position of 2.9 millimeters, whereas the measured position was 1.7 millimeters.

The test, and the inferences that may be drawn from it, go to causation, not to breach. This is so because whether and how far the button was recessed from its normal position goes to whether the latch plate in fact came undone on the day of the accident and thus caused Easterling's injuries. But Ford has not once argued that we should affirm the District Court's grant of summary judgment on the basis that the record contains insufficient admissible evidence of causation; it has argued only that there is insufficient evidence of breach. Even if such an argument could somehow be gleaned from Ford's brief, Ford has brought us no law on causation to

11

apply to the facts of this case.  We thus follow our usual practice of addressing only those issues raised by the parties.  *See, e.g.*, *United States v. Levy*, 416 F.3d 1273, 1275 (11th Cir. 2005) (per curiam) (observing "our prudential rule that issues not raised in a party's initial brief are deemed abandoned and generally will not be considered").

### IV.

The District Court's order granting summary judgment for Ford is **VACATED**.  The case is **REMANDED** for further proceedings consistent with this opinion.