[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 15, 2008
THOMAS K. KAHN
CLERK

_____

No.06-13309
_____

D. C. Docket No. 05-21023-CV-KMM

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
a federally recognized Indian Tribe,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,
ENVIRONMENTAL PROTECTION AGENCY,
JIMMY PALMER, Regional Administrator of the
EPA, Region IV, STEPHEN L. JOHNSON, Acting Administrator of the EPA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 15, 2008)

Before DUBINA and MARCUS, Circuit Judges, and PROCTOR,* District Judge.

_____

*The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

PROCTOR, District Judge:

The Miccosukee Tribe of Indians (the "Tribe") appeals from an order granting summary judgment in favor of the United States of America; the Environmental Protection Agency; Stephen L. Johnson, Administrator of the EPA; and Jimmy Palmer, Regional Administrator of EPA Region IV (collectively the "EPA") with respect to the Tribe's claims pursuant to the Freedom of Information Act ("FOIA"). The Tribe contends that the district court erred by finding the EPA conducted an adequate search in response to the Tribe's two FOIA requests (an initial request on February 18, 2004, and a supplemental request on June 3, 2004) for documents concerning the EPA's Clean Water Act review of Florida's amendments to the Everglades Forever Act ("EFA") and the Phosphorus Rule for the Everglades Protection Area. It also challenges the district court's determination, after an *in camera* review, that all withheld documents were properly designated by the EPA as privileged. After careful review, we affirm in part and vacate in part, and remand this case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

On February 18, 2004, the Tribe submitted a FOIA request to the EPA seeking documents concerning the EFA. On March 2, 2004, the EPA advised the Tribe that it would not be able to respond until July 2004 due to the voluminous nature of the records and the EPA's policy of processing requests on a "first-in, first-out basis."

Shortly thereafter, on June 3, 2004, the Tribe wrote a supplemental letter to the EPA, requesting documents "concerning the State of Florida's so-called default criterion for phosphorus," a provision of the EFA that the EPA approved subsequent to the Tribe's February FOIA request. In this supplemental letter, the Tribe contested the EPA's characterization of the initial request as voluminous as well as the EPA's need to extend the time until July 2004 for it to respond. Moreover, the Tribe stated "we [have] no desire to have EPA produce voluminous publicly released documents that we already have."

On July 20, 2004, the Tribe traveled to the EPA Regional Office in Atlanta, Georgia, to review the produced documents deemed by the EPA to be "voluminous" in nature. Two and one-half boxes containing approximately 3,255 pages of documents were presented to the Tribe for review. The Tribe made no secret of the fact that it was disappointed by the small number of documents made available for it to review.

On August 2, 2004, the EPA sent the Tribe a list of the documents not provided for review that the EPA maintained were exempt from disclosure under FOIA Exemption 5. *See* 5 U.S.C. § 552(b)(5). The Tribe avers that the list was too general and did not allow it to determine whether a privilege was properly invoked.

On April 13, 2005, the Tribe filed a lawsuit in the Southern District of Florida against the EPA alleging that the EPA failed to comply with FOIA.[1] The EPA answered on May 13, 2005, maintaining that the Tribe's complaint failed to state a claim upon which relief could be granted and that any withheld documents were properly exempt from disclosure under Section 552(b)(5).

In July 2005, the Tribe sought to depose three EPA Region 4 employees: Philip Mancusi-Ungaro, EPA Region 4 attorney advisor on Everglades water quality issues; Daniel Scheidt, the EPA's senior water quality scientist; and Gail Mitchell, Deputy Division Director of the Water Management Division. On July 15, 2005, a magistrate judge granted the Tribe's request by permitting it to depose the EPA employee identified by the agency as having conducted the search for

---

[1] On September 13, 2004, the Tribe filed an administrative appeal of the EPA's FOIA denial, which was still pending at the time the complaint in this case was filed. Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), the EPA had twenty days to respond to the Tribe's administrative appeal.

records in this matter. Thus, in lieu of the three employees originally requested by the Tribe, the EPA produced for deposition on August 11, 2005, Randy Dominy, Chief of the FOIA and Records Services Section in EPA Region 4. At that time, Dominy was the chief responsible for supervising FOIA search efforts and maintaining the records for Region 4.[2]

On August 31, 2005, shortly after Dominy's deposition, the EPA produced a supplemental release of 130 documents (some in whole and others in part) responsive to the Tribe's FOIA requests. The EPA stated that upon further review of the previously withheld 130 documents, it had determined that 12 documents could be released in full, and 118 more could be released in a redacted form.

After the supplemental document production, the Tribe sought the deposition of Jennifer Pearce, the EPA FOIA Specialist that Dominy testified had conducted the search, to gain more insight into the EPA's FOIA search and

---

[2] The Tribe complains that during the deposition, Dominy revealed that another EPA employee, Jennifer Pearce, actually conducted the search for records in this matter, and that she had the most knowledge of the search. Dominy testified that he was not even on board in his current position when the search was conducted. After these revelations, the Tribe requested that the EPA make Jennifer Pearce available for deposition consistent with Magistrate Judge Garber's ruling. The EPA declined to make Jennifer Pearce available and continued to insist that Randy Dominy, who had testified that Pearce had the most knowledge of the search and that he was not even in his position during that time, was the proper deponent.

withholdings. The EPA objected to Pearce's deposition.[3] On September 2, 2005, during another discovery hearing, the district court ordered that the deposition of Jennifer Pearce be taken regarding her knowledge of the search.

On September 6, 2005, the EPA moved for summary judgment which the Tribe opposed. Attached to the EPA's summary judgment motion were affidavits from Randy Dominy and EPA Region 4 Assistant Regional Administrator Russell L. Wright, Jr. The motion was also accompanied by a *Vaughn*[4] Index of the withheld documents. The Dominy Affidavit explained the process by which the EPA had conducted its search for records responsive to the Tribe's two FOIA requests. The Wright Affidavit described the documents which were withheld, in whole or in part, and explained the basis upon which the records deemed exempt were withheld.

The EPA's dispositive motion was filed while discovery was still pending; therefore, on September 12, 2005, the Tribe requested additional time to file a cross-motion for summary judgment and its opposition to the EPA's motion for summary judgment. Also on September 12, 2006, the EPA filed a motion for

---

[3] The EPA declined to make Pearce available for deposition and continued to insist that Dominy was the proper deponent, despite Dominy's testimony that he was not in his position at the time of the search and that Pearce had the most knowledge about the search.

[4] *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

relief from the district court's September 2, 2005 order regarding the deposition of Jennifer Pearce. On October 3, 2005, the district court granted in part the Tribe's request for a continuance, denied the EPA's motion for relief from the discovery order, and ordered the EPA to make Jennifer Pearce available for deposition.

On October 7, 2005, the Tribe took Jennifer Pearce's deposition. Her testimony revealed that she had coordinated the EPA's search for records responsive to the Tribe's February and June 2004 FOIA requests and had served as a conduit by forwarding the Tribe's requests to those EPA employees who could locate and provide responsive records.

On October 21, 2005, the Tribe filed its opposition to the EPA's motion for summary judgment. Attached to its opposition were two affidavits purporting to raise issues of material fact that would prevent judgment as a matter of law. First, the Tribe relied on the affidavit of Dr. Terry L. Rice, its hydrology consultant, who incorporated into his affidavit an e-mail forwarding a scientific article to EPA Scientist Daniel Scheidt. Because the attached e-mail and article had not been produced by the EPA in response to the Tribe's FOIA requests, the Tribe argued the existence of a genuine issue of material fact concerning the adequacy of the EPA's search. Second, the Tribe included with its opposition an affidavit by Joette Lorion, an environmental consultant to the Tribe and paralegal to the law

7

firm representing the Tribe. Lorion maintained that: (1) certain consultants to the EPA were, in fact, consultants to the Department of Interior; (2) she had personally seen documents created by EPA attorney Philip Mancusi-Ungaro that were neither produced nor listed as withheld; (3) she was led to believe that the EPA Region 4's number of responsive documents was far greater than the amount produced; and (4) when she reviewed the State of Florida's documents on the amended EFA and the Phosphorus Rule, the State had produced a room full of documents as opposed to the several boxes the EPA had produced. Among the requests included in the Tribe's opposition were additional discovery as well as an *in camera* review by the court of the withheld documents.

When the Tribe re-articulated its concerns regarding the EPA's FOIA search and withholdings at the November 17, 2005 pre-trial conference, the district court permitted the Tribe to take additional discovery prior to resolution of the motions for summary judgment. Specifically, in its December 6, 2005 Order, the district court directed the EPA to present the following employees for deposition  as to matters related to the scope and adequacy of the agency's records search: Philip Mancusi-Ungaro, EPA Region 4 attorney advisor on water quality issues; Daniel Scheidt, EPA Region 4 senior water quality scientist; and Cecilia Harper, environmental scientist who helped with the FOIA search. Moreover, in light of

the Tribe's concerns that the EPA's *Vaughn* Index was not specific enough, and that the EPA was improperly invoking numerous privileges pursuant to Exemption 5 of FOIA, the district court agreed to conduct an *in camera* review of the withheld documents.  The district court also directed the parties to file supplemental motions for summary judgment following the completion of the additional discovery.

On January 9-10, 2006, the Tribe deposed the three EPA employees–Harper, Scheidt, and Mancusi-Ungaro.  During his deposition, Scheidt testified that he possessed many responsive documents, including e-mail messages, copies of presentations and personal notes, that he had failed to produce in response to the Tribe's FOIA requests.  Thereafter, the EPA conducted a supplemental search of Scheidt's files only and on February 13, 2006, produced thirty additional documents responsive to the Tribe's 2004 FOIA requests.[5]

---

[5] The thirty additional documents from Scheidt's files consisted of his personal notes on documents of public meetings of the State of Florida Environmental Regulation Committee (ERC), various notes and copies of public ERC presentations on which he made notes, and some additional e-mail messages in his ERC files.  Portions of the e-mails were redacted, but the remaining documents were provided in their entirety on February 12, 2006.  The redacted portions were subsequently produced to the district court for an *in camera* review, and the court found that they had been properly withheld under the deliberative process privilege and the attorney-client privilege.

9

On January 17, 2006, following the *in camera* review, the district court determined that all of the EPA documents reviewed by the court had been properly designated as privileged.

On February 21, 2006, both the Tribe and the EPA filed supplemental summary judgment briefs to the district court addressing new developments including newly discovered evidence. In its supplemental filing, the EPA announced that it was withholding three additional documents that it discovered subsequent to the Scheidt deposition. The EPA also relied on, and filed copies of, the depositions of Mancusi-Ungaro, Scheidt, and Harper[6] and affidavits from Scheidt and EPA Assistant General Counsel Byron R. Brown. The EPA further supplemented its motion with a copy of the Tribe's December 23, 2005 FOIA request seeking additional records that had been produced since the February 2004 FOIA request.

In its supplemental filing, the Tribe asserted that additional discovery had revealed factual discrepancies that compelled the denial of the EPA's motion for summary judgment. The Tribe also requested that the district court grant summary judgment in its favor and order the EPA to conduct a new search for responsive documents to the February 18, 2004 and June 3, 2004 FOIA requests.

---

[6] The depositions of Dominy and Pearce had already been filed.

10

On March 7, 2006, after an *in camera* review of the withheld documents identified as privileged after the Scheidt deposition, the court held those documents had also been properly withheld.

On April 5, 2006, the district court granted summary judgment to the EPA holding that the EPA's FOIA search was adequate. The Tribe filed a timely notice of appeal. The Tribe appeals from the district court's April 5, 2006 Final Order regarding the adequacy of the search, as well as the court's two previous orders regarding the exempt status of those documents on the basis of privilege.

## II. ISSUES PRESENTED

We must address two questions in this case. First, did the district court properly grant the EPA's motion for summary judgment regarding the reasonableness and adequacy of its search for, and disclosure of, responsive documents to the Tribe's February and June 2004 FOIA requests? Second, did the district court err in sustaining the EPA's assertion of privileges and consequent withholding of responsive documents under FOIA Exemption 5?

## III. STANDARD OF REVIEW

### A. Review of Summary Judgment Regarding Adequacy of FOIA Search

This court reviews a district court's grant of summary judgment in a FOIA case *de novo*, viewing all facts and reasonable inferences in the light most

11

favorable to the non-moving party, and applying the same standard used by the district court. *Office of Capital Collateral Counsel, N. Region of Fla. v. U.S. Dep't of Justice*, 331 F.3d 799, 802 (11th Cir. 2003); *Tullius v. Albright*, 240 F.3d 1317, 1319-20 (11th Cir. 2001). "Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified." *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir. 1993). Summary judgment is appropriate if the pleadings, depositions, admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat summary judgment unless it is both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is "material" if it would affect the outcome of the suit under the governing law, and "genuine" if a reasonable trier of fact could return judgment for the non-moving party. *Id.*

## B.     Review of Sustainment of Section 5 Privileges Claim

This Court has held that in reviewing a finding of privilege for exemptions, we have the duty to determine whether: (1) the district court "had an adequate factual basis for the decision it rendered;" and (2) the decision reached by the

district court was clearly erroneous. *Ely v. F.B.I.*, 781 F.2d 1487, 1490 (11th Cir. 1986) (citations omitted); *Currie v. I.R.S.*, 704 F.2d 523, 528 (11th Cir. 1983).

## IV.  DISCUSSION

### A.    Summary Judgment Regarding Adequacy of FOIA Search

The purpose of FOIA "is to encourage public disclosure of information so citizens may understand what their government is doing." *Office of the Capital Collateral Counsel*, 331 F.3d at 802.  Congress enacted FOIA to "enable the public to have access to government information that is unnecessarily shielded from public view."  *Nadler v. U.S. Dep't of Justice*, 955 F.2d 1479, 1484 (11th Cir. 1992), *overruled on other grounds by U.S. Dep't Of Justice v. Landano*, 508 U.S. 165 (1993).

The Tribe's arguments on appeal, organized in their logical progression, are as follows: (1) as a threshold matter, the evidence presented by the EPA was simply not sufficient to even permit the district court to make a determination on the merits regarding the adequacy and reasonableness of the search; (2) even if the EPA's evidence was sufficient, the trial court improperly resolved disputed issues of fact by granting summary judgment when it should have denied summary judgment and conducted an evidentiary hearing to resolve "numerous inconsistencies in the testimony;" and (3) even if the Rule 56 evidence was

13

sufficient and undisputed, the summary judgment record demonstrates that the search was not adequate or reasonable to warrant a grant of summary judgment. Each argument is addressed below in turn.

### 1. Sufficiency of the Evidence Before the Trial Court

The Tribe first argues that the evidence presented by the EPA was simply not sufficient for the district court to determine on the merits whether the search was adequate and reasonable. This is a threshold issue. Setting aside the question of whether the search was reasonable based upon the Rule 56 record, the court must determine whether the Rule 56 record before the trial court was adequate for it to make a summary judgment determination. The Tribe's argument is two-fold: (1) the Dominy Affidavit alone is not sufficient evidence of the reasonableness of the search because he did not participate in it; and (2) the testimony before the trial court did not contain the requisite level of detail regarding the specifics of the search to allow the court to ascertain its reasonableness.

### a. The EPA's Rule 56 Evidence

Before the court can address the Tribe's arguments, however, it is important to review the principal Rule 56 evidence presented by the EPA regarding its searches.

**i.** **Affidavit of Randy Dominy and Deposition of Jennifer Pearce**

The EPA's primary testimony regarding the searches incident to the Tribe's February and June FOIA requests arose from two sources. First, the EPA relied on the affidavit of Randy Dominy, the current Region 4 Chief of the EPA FOIA and Records Services Division. Dominy, who was the representative designated by the EPA to demonstrate that the search was adequate in response to the magistrate judge's July 15, 2005 discovery order, testified concerning the scope and process of EPA FOIA searches in general and the February and June FOIA searches in particular. Second, the EPA proffered the deposition testimony of Region 4 Records Section FOIA specialist Jennifer Pearce, to whom the Tribe's requests were routed when they came through the Records Section.

According to Dominy, with respect to the February request, Pearce contacted Mancusi-Ungaro, an EPA attorney adviser on Everglades water issues, and Harper, an environmental scientist who had reviewed State of Florida water quality standards, and asked them to search for records responsive to the Tribe's FOIA request and to identify other personnel who would also have responsive records. Additional EPA Region 4 employees conducted searches of their files, including Fritz Wagener and Gail Mitchell. Moreover, documents were produced

by Jim Keating from EPA Headquarters in Washington, D.C. After a number of additional personnel were identified as persons who may also have responsive documents (sixteen in all), those EPA employees were provided with the Tribe's February FOIA request and asked to search all "correspondence, electronic transmissions, draft documents, briefing materials, and other relevant materials in any hard copy and electronic files to which they had access." Dominy also averred that a similar search was performed for the supplemental June FOIA request.

                        ii.      **Cecilia Harper Testimony**

Pearce testified that upon receipt of the Tribe's February FOIA, she contacted Mancusi-Ungaro. Additionally, Pearce asked Cecilia Harper, an environmental scientist in the Water Management Division, for names of personnel who would have responsive records. Pearce began searching all EPA programs for information about the February FOIA request. Once she found programs that might have responsive documents, she sent a copy of the February FOIA request to the EPA employees she thought might have documents and delivered a copy to a coordinator in each division.

According to Cecilia Harper, she reviewed her e-mails for documents responsive to the Tribe's FOIA request and gathered all of her relevant hard copy

16

documents which she had arranged in binders by subject. Harper testified that she provided to Pearce all responsive e-mails, in both her archives and her electronic inbox, in addition to all of her hard copy binders.

### iii. Daniel Scheidt Testimony

Daniel Scheidt, a senior water quality scientist at the EPA, testified with respect to the February request that he conducted a similar search of his electronic and hard copy documents. Scheidt indicated that he read the entire document request, number-by-number, looked at each numbered request to determine whether or not he had any documents in his possession that may be responsive, and if he did have any responsive documents, copied them and produced them. Scheidt indicated that he did not produce "publicly available documents" because his understanding was that the Tribe did not seek documents in that category. However, during his deposition, Scheidt testified that he realized there may have been some internal EPA notations on certain publicly available documents that would be responsive to the Tribe's request because they would not be in the public domain. Accordingly, after his deposition, Scheidt again reviewed his files and produced thirty additional documents. While Scheidt could not recall personally receiving the Tribe's June FOIA request, he stated in his affidavit that any

17

documents in his possession that were responsive to the June request would have been produced in response to the February FOIA request.

### iv. Phillip Mancusi-Ungaro Testimony

Finally, Mancusi-Ungaro said that he searched his electronic and hard copy files and produced all documents he believed were responsive. Like Scheidt, Mancusi-Ungaro did not consider publicly available documents to be responsive.

Having summarized the relevant EPA evidence before the district court on summary judgment, we now turn to the Tribe's two arguments that the above-described evidence was insufficient for the district court to even consider the issue of reasonableness.

### b. Sufficiency of the Dominy Affidavit

The Tribe first contends that the affidavit of Dominy, the representative designated by the EPA to demonstrate that the search was adequate, is insufficient evidence by which to judge the search's reasonableness because he was not the person who conducted the search and was not even in his position at the time the search was conducted. It is true that Dominy is the *current* Region 4 Chief of the EPA FOIA and Records Services Division. However, it is also undisputed that Dominy did not personally perform the search regarding the Tribe's FOIA requests; Jennifer Pearce was the employee who coordinated those efforts.

18

The EPA points to at least two other Circuits that have held that the agency employee who *actually performed* a search need not be the one to supply an affidavit or sworn testimony describing the adequacy of the search so long as an official responsible for *supervising* the search efforts has provided testimony in one form or another. *See Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993) (holding that affidavits of officials responsible for supervising search efforts are sufficient to fulfill the personal knowledge requirement of Fed. R. Civ. P. 56(e)); *Patterson v. I.R.S.*, 56 F.3d 832, 840-41 (7th Cir. 1995) (holding that declarant's reliance on a standard search form completed by his predecessor was appropriate). Although this Circuit has not pronounced a rule requiring testimony from the person who performed the search in order to demonstrate its adequacy under Rule 56, it need not do so in this case. Because the district court below granted depositions of other agents who actually performed the search, and because those depositions were submitted in the Rule 56 record, this court need not reach the issue of whether the Dominy Affidavit, in isolation, would be sufficient to demonstrate the adequacy of the FOIA search. Here, the Tribe not only deposed Dominy, but also Pearce who undisputedly participated in the search. As the district court correctly noted in its summary judgment order in favor of the EPA,

19

whether that affidavit was adequate, in isolation, was irrelevant because "the Court . . . granted wide latitude to the Plaintiff in conducting additional discovery."

### c. Sufficiency of the Level of Detail in the Testimony

Thus, the court turns to the second layer of the Tribe's sufficiency argument—the level of search detail outlined by the testimony as a whole. The Rule 56 record includes five depositions that were taken in this case. In each of those depositions, the Tribe questioned the deponent regarding how he or she conducted a search, which files were reviewed, what search terms were used, how the documents were produced to Pearce, whether any documents were withheld from production, who made the decisions about withholding, and other relevant questions. Pearce testified that she was asked specific questions about the substance of Dominy's Affidavit, including who searched for responsive documents. She corroborated the points in Dominy's Affidavit regarding the people and offices that were contacted.

Thus, the Tribe's singular focus on the Dominy Affidavit is misguided. It is irrelevant that Dominey failed to aver that "all files likely to contain responsive materials were searched" and did not detail the exact procedures used by each individual involved to search for records, including how the records were searched and the search terms used, the type of search performed, or which files were

20

searched. Although Dominy described only in general terms how the EPA logged and filtered the request to various employees throughout the agency (*i.e.,* Dominy's office contacted sixteen EPA employees regarding the Tribe's FOIA requests, that is only one part of the complete picture. The deposition testimony from other individuals who actually performed the search fills in any missing blanks about the specifics of how the search was conducted.

To be sure, the Tribe did not have the opportunity to depose all sixteen employees involved in the search in order to ask each and every one of them specific questions about their searches. But that is not the issue here. The Tribe does not contend on appeal that it was erroneously denied adequate discovery. Rather, the question is whether the district court *needed* testimony before it from each of the sixteen employees that the EPA identified in order to consider the adequacy of the search – as the Tribe puts it, to have testimony from each individual involved regarding whether they searched the same kinds of records or whether some performed one kind of search and others performed a different kind of search, or even whether all sixteen employees actually searched.[7]

---

[7] In other words, the Tribe complains that while the testimony provides renditions of how each of those employees individually searched their files, neither the Dominy Affidavit nor the Scheidt deposition support the proposition that all of the thirteen other employees who participated in the search, including Fritz Wagner, Jim Keating, and Gail Mitchell, actually searched their files, nor does that evidence describe the search method each employee used.

The Tribe maintains that such exacting testimony from each person involved is called for in light of decisions such as the D.C. Circuit's opinion in *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990), which requires "reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68. Specifically, *Oglesby* held that:

> [a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.

*Oglesby*, 920 F.2d at 68. Later in *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548 (D.C. Cir. 1994), the D.C. Circuit reiterated that "agency affidavits that 'do not denote which files were searched, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requestor] to challenge the procedures utilized' are insufficient to support summary judgment." *Steinberg*, 23 F.3d at 552.

This Circuit has not imposed the specific requirements set forth in the D.C. Circuit. Nor has it even come close to adopting a more exacting rule like that

22

suggested by the Tribe here -- a rule that would extend beyond *Oglesby* and *Steinberg* to require not just one reasonably detailed affidavit on behalf of the EPA setting forth the required details, but testimony from *every* participant in the search setting forth terms used, the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched. This Circuit has only stated that "the agency must show beyond a material doubt…that it has conducted a search reasonably calculated to uncover all relevant documents." *Ray v. U.S. Dep't of Justice,* 908 F.2d 1549, 1558 (11th Cir. 1990).

To pronounce a rule in this Circuit setting forth the Tribe's requested extension of the D.C. Circuit rule would place too heavy a burden on an agency responding to a FOIA request to provide testimony from each individual involved in the FOIA search. Implicit in the Tribe's argument is its disapproval of the fact that the employees involved in the search maintain their files in individual manners and, hence, went about their searches in individual methods. No one, however, testified that they held back documents that they thought were responsive with the exception of the now disputed "publicly available documents" (addressed *infra*). Thus, the better course here is to ask whether, based upon this court's prior precedent and the plethora of evidence in this case, the Dominy Affidavit, in conjunction with the other deposition testimony provided, provided

23

sufficient evidence for the trial court to determine whether the EPA "conducted a search reasonably calculated to uncover all relevant documents." *Ray v. U.S. Dep't of Justice,* 908 F.2d 1549, 1558 (11th Cir. 1990) (quotations omitted), *rev'd on other grounds*, *U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991).  We answer this threshold question in the affirmative.

## 2.    Whether Disputed Issues of Fact Preclude Summary Judgment

The Tribe next maintains that even assuming the evidence provided a sufficient basis upon which the court could judge the reasonableness of the search, rather than granting summary judgment, the district court should have conducted an evidentiary hearing to resolve "numerous inconsistencies in the testimony." This argument again sets aside the merits question of whether the search was adequate, and instead challenges the district court's definition of certain factual discrepancies as "irrelevant."[8]  According to the Tribe, the district court inappropriately relied on a sister case from its district for the proposition that an agency is entitled to summary judgment "if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced…or is wholly exempt from the Act's inspection requirements.'"

---

[8] Notably, with regard to the Tribe's assertions that there are discrepancies in the record, the district court concluded that the Tribe engaged in a game of "gotcha" by pointing to discrepancies that were "clearly irrelevant."

24

*Florida Immigrant Advocacy Ctr. v. Nat'l Sec. Agency*, 380 F. Supp. 2d 1332, 1336-37 (S.D. Fla. 2005). Instead, the Tribe believes that, given the number of relevant disputed facts, the district court should have looked to a different case from the Southern District of Florida that advocates conducting an evidentiary hearing to resolve the disputed factual issues. *Sun-Sentinel Co. v. U.S. Dep't of Homeland Sec.*, 431 F. Supp. 2d 1258, 1276 (S.D. Fla. 2006) (disputed issues of material fact made summary judgment in FOIA case inappropriate and the court must hold an evidentiary hearing to resolve the factual issues).

The Tribe's argument regarding factual disputes in the Rule 56 record focuses primarily on alleged inconsistencies between the averments in Dominy's Affidavit and the Rule 56 testimony provided by other deponents. In his affidavit, Dominy claimed that, upon receipt of the Tribe's February 18, 2004 FOIA request, his office contacted Mancusi-Ungaro and Harper and asked them to identify other personnel who might have records responsive to the Tribe's request. The Tribe asserts that the district court only considered that portion of the Rule 56 evidence that supported its conclusion that the search was adequate.[9] Specifically,

_____

[9] For example, the Tribe notes that the district court cited to the Dominy Affidavit for its conclusion that after additional EPA personnel were identified, they searched "correspondence, electronic transmissions, draft documents, briefing materials, and other relevant materials in any hard copies and electronic files to which they had access." Nonetheless, the cited paragraph from Dominy's Affidavit states only that certain personnel were "requested" to search for records, and it was merely his "belief and understanding" that they "searched for responsive records."

the Tribe points to three categories of disputed evidence that it believes should have prevented the grant of summary judgment: (1) evidence from Scheidt that he did not recall responding to the June request; (2) deposition testimony that contradicts Dominy's Affidavit that responsive documents were produced, and demonstrates that certain documents were not produced even though they were responsive; and (3) evidence regarding who should have been contacted for records and who actually coordinated the search. The court will address each argument in turn.

### a. Evidence that Scheidt Did Not Recall Responding to the June Request

The Tribe points again and again to evidence that at least one employee on Dominy's list - Dan Scheidt, the lead scientist on the phosphorus criterion - appears to have been overlooked with respect to the search in response to the June 3rd FOIA request concerning the default phosphorus criterion. Dominy claimed that each person listed in his Affidavit received a copy of the February 18th FOIA request and was again contacted about the Tribe's June 3rd FOIA request. Dominy also stated that all employees working on the EPA's phosphorus criterion - presumably including Scheidt - searched for responsive records. However,

_____

Moreover, the cited paragraph appears to relate only to the June FOIA request.

26

Scheidt testified that he did not recall providing documents responsive to the Tribe's June 3rd FOIA request which targeted documents concerning his area of expertise.

The district court's order recognized that "Scheidt [] indicated he did not recall responding to Plaintiff's second request." The Tribe contends that whether Scheidt received the June 3rd request, and whether he ever responded it to it, are issues of material fact that are relevant to the adequacy of the search and that the district court should have ordered a new search so that Scheidt could determine whether he had additional documents responsive to Plaintiff's requests. The EPA maintains that the Tribe is simply mistaken and that there is not an issue of *material* fact regarding whether Scheidt was ever sent the June 2004 FOIA request given his testimony that no new documents would have been produced after the February FOIA.

The undisputed testimony indicates the following: (1) Scheidt testified at his deposition that he had other documents responsive to the Tribe's FOIA requests that he did not produce because he assumed the Tribe had them; (2) Scheidt further testified that he excluded from his disclosure scientific publications, agency reports, journal articles and Florida Environmental Regulation Commission ("ERC") testimony; (3) after the deposition, the EPA provided to the

27

Tribe more than 30 documents from Scheidt; and (4) Scheidt later provided a sworn Affidavit stating that any documents in his possession that would have been responsive to the June 2004 FOIA request were also responsive to the February 2004 FOIA request that he did receive and to which he did respond.[10] Even now, after having received additional documents from Scheidt, the Tribe still believes that the EPA's search was not adequate to uncover all Scheidt's documents based solely on the fact that he did not recall seeing or responding to the Tribe's June 3rd request.

Scheidt has admitted that he did not recall the request specifically, but he has also explained his efforts to locate responsive documents and produce them after the time that the request was made. Even if he did not lay eyes on the request in written form, his post-request search would have covered any documents responsive thereto. Therefore, his admission does not create a disputed fact. The

_____

[10] The EPA argues that the truth of Scheidt's assertion is corroborated by Harper's testimony that she found no more documents responsive to the June 2004 FOIA request. The EPA further avers that Harper's testimony that she remembered delivering only her own documents to Pearce, despite the fact that she was the coordinator for the water division, does not undercut the fact that Scheidt said that he delivered his own documents to Pearce. Pearce agreed that she received Scheidt's documents because she said that the majority of the responsive documents came from the Water Division where Scheidt worked. Harper, who had never been deposed before, could not remember several facts after the elapse of one and one-half to two years between the Tribe's FOIA and her deposition, but she did remember that she had delivered all the responsive documents in her possession to Pearce.

undisputed evidence indicates that Scheidt was deposed and asked questions about what documents he had and what he did to search for documents that would have satisfied both requests.  We find that the district court did not err in finding that Scheidt's testimony was undisputed and that his testimony did not create a material issue of fact regarding his search.

### b. Deposition Testimony Indicating that Specific Responsive Documents Were Not Produced

Next the Tribe points to several alleged inconsistencies between what the deponents thought they had provided and what was actually provided.  For example, Scheidt testified that he had produced documents responsive to the Tribe's FOIA request concerning effects on the Tribe as a downstream user.  The Tribe believes, however, that based upon a review of the document list and *Vaughn* Index, those documents were not provided.  Additionally, Scheidt admitted that he failed to produce notes of ERC meetings—notes that the Tribe believes were clearly requested by the February 18th request and should have been produced.  Finally, Mancusi-Ungaro admitted at his deposition that the EPA had failed to produce a document he had faxed to the State of Florida that was

29

responsive to the Tribe's FOIA requests. Mancusi-Ungaro also said that he could not recall whether he sent other documents to the State of Florida that would have been responsive to the FOIA requests. Based principally on these examples, the Tribe points to inconsistencies between what the EPA averred was provided and what the testimony shows should have been provided but was not.

The EPA does not offer a specific response to each of the documents identified by the Tribe above, opting instead to argue generally that an agency is not required to prove that every single responsive document was produced to demonstrate the adequacy of the search. *See Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995). Accordingly, the EPA maintains that a search is not presumed unreasonable simply because an agency failed to produce all relevant documents. *Nation Magazine*, 71 F.3d at 892 n.7.

      **c.    Evidence Regarding Other Employees Who Had Records Who Were Not Contacted and Who Actually Coordinated the Search**

The Tribe next highlights what it considers to be contradictory evidence regarding how the search was conducted. First, the Tribe notes that even though Dominy lists Richard Harvey (Director of the EPA's South Florida office in West Palm Beach and an employee of Region 4 Water Division) as a person who

30

received both requests, there is no documented proof in the record that Harvey ever received or responded to the requests. Mancusi-Ungaro testified that he does not recall giving Harvey's name to Pearce, and Harper said she did not coordinate with Harvey to gather documents. Nevertheless, despite the Tribe's arguments, testimony from Pearce indicates that she gave Harvey the FOIA requests. Further, in a search of this magnitude, the lack of witness recollection of specific contact with Harvey does not create a material disputed fact.[11]

The Tribe also accuses Dominy and Pearce of misrepresenting that Mancusi-Ungaro had a more active role in coordinating the search, while Mancusi-Ungaro testified that he merely searched for documents in his possession, but had no role in contacting employees or conducting the search. Moreover, the Tribe asserts that the EPA's claim (through the testimony of Pearce) that Harper was the "coordinator" chosen to filter the FOIA requests and gather documents from other employees was contradicted by Harper's own testimony that, with regard to the February request, she delivered only her own documents to Pearce.

---

[11] The Tribe also suggests that because Jimmy Palmer (the Regional Administrator of the EPA), and Bill Walker and Bob Kadlec (identified as the EPA consultants in the privilege log), should have been on Dominy's list but were not, we must conclude that they did not provide responsive documents. The evidence demonstrates, however, that even if Walker and Kadlec were not contacted directly for documents, any responsive documents in their possession would have been produced by others on their behalf. Scheidt, who was the project manager for Walker and Kadlec's consultation contracts, established that he had produced all documents they had sent him on the requested FOIA issues.

Indeed, contrary to both the Dominy Affidavit and Pearce deposition, other evidence in the record suggests that, as to the June request, Harper did not provide names or act as a coordinator.

Again, the EPA does not specifically respond to any of the Tribe's assertions or the supporting evidence, averring only generally that "the Tribe repeatedly mischaracterizes Pearce's role as having searched for responsive records when, in fact, Pearce coordinated the search for responsive records." The EPA's failure to address these issues head on is not only troubling, but fatal to its position on this appeal. The evidence to which the Tribe points goes beyond suggesting that the EPA failed to produce a stray document or two. Rather, the inconsistencies in the testimony indicate that the process employed by the EPA was defective, thereby rendering its FOIA search and response inadequate. Accordingly, we find there are material issues of fact regarding whether those conducting the search reasonably made an effort to contact all employees who had responsive records and whether the search efforts were properly coordinated. For this reason alone, the district court's grant of summary judgment in favor of the EPA on the adequacy of the search was inappropriate.

**3.    Whether the Undisputed Facts Demonstrate that the EPA's Search Was Adequate and Reasonable**

In the final alternative, the Tribe maintains that even if the evidence before the district court was sufficient to determine the adequacy of the search and was undisputed, it did not demonstrate that the search was adequate and reasonable to warrant the granting of summary judgment. Specifically, the Tribe takes issue with the EPA's explanations for: (1) not producing any documents in the "publicly available" category; and (2) belatedly producing 160 documents as a supplemental FOIA response.

### a. Whether the EPA's Exclusion of Voluminous Publicly Available Documents Was Reasonable

The main - and perhaps best - argument presented by the Tribe is that the EPA inappropriately excluded from its FOIA production all documents they deemed to be "publicly available," and that the district court improperly found the evidence on this issue to be undisputed and the exclusion to be reasonable. We have reviewed this evidence *de novo*, and find that a material issue of fact exists with respect to that exclusion of documents.

The undisputed evidence indicates the following. When the EPA began the process of responding to the Tribe's February FOIA request, both Scheidt and Mancusi-Ungaro told Pearce that the responsive documents might be voluminous. In light of this suggestion and the sheer number of EPA sectors and employees

33

initially contacted about the request, the EPA wrote to the Tribe on March 2, 2004 requesting additional time until July 2004 to respond.  In its June 2004 reply to the EPA, the Tribe stated: "we [do] not agree the request [is] voluminous . . . and . . . we [have] no desire to have EPA produce voluminous <u>publicly released documents which we already have</u>."  (emphasis added).

The EPA "interpreted"[12] the Tribe's desire not to receive voluminous publicly released documents it already had to be license for the EPA to exclude <u>all</u> publicly available documents in addition to all duplicate documents.  EPA witnesses alluded to an e-mail issued by Pearce to those who had been asked to produce documents indicating that certain voluminous and publicly available documents should be excluded from their production.[13]  The Tribe's February 18th

---

[12] As the Tribe notes in its reply brief on appeal, the EPA's appellee brief conveniently omitted language from the Tribe's June 2004 letter, making it appear as if the purported agreed-upon exclusion was broader than actually stated. The EPA selectively quotes the Tribe as stating it had "no desire to have EPA produce voluminous publicly released documents."  This characterization by the EPA ignores the context of the statement, which was the result of a conversation with EPA representatives:  "We spoke to EPA representatives to clarify our request…"  The EPA also excludes the qualifying words at the end of the sentence limiting the permitted exclusion to "documents which we already have."

[13] The elusive Pearce e-mail allegedly instructing the exclusion of all publicly available documents was never produced by the EPA nor mentioned in Pearce's deposition. However, both Scheidt and Mancusi-Ungaro testified that an e-mail from Pearce caused them not to produce broad categories of documents responsive to the Tribe's February 18th FOIA Request.  Scheidt testified "but there again, there's certain things I did not produce  based on guidance I got from Jennifer by e-mail."  Based on  the suggestion in Pearce's e-mail,  Scheidt excluded scientific publications, agency reports, journal articles, and ERC testimony.  Mancusi-Ungaro also testified that Pearce's e-mail affected his production of documents, even though he admitted that the

34

FOIA request on its face seeks "any and all records," and even the Tribe's June 3rd FOIA request, which contains the operative statement about "voluminous" publicly available documents, also asks for "all records."

Nevertheless, the district court concluded that "it is entirely reasonable to exclude documents available to the public from a FOIA request, especially where the Plaintiff specifically exclaims that it has 'no desire to have EPA produce voluminous publicly released documents.'" In essence, the court drew its own conclusion about what the Tribe could reasonably request – it saw "no reason why it should require the EPA to produce documents that are available to the general public."

Pearce testified that upon receipt of the Tribe's February FOIA, she contacted Mancusi-Ungaro. Additionally, Pearce asked Cecelia Harper, an environmental scientist in the Water Management Division for names of personnel who would have responsive records. Pearce began searching all EPA programs for information about the February FOIA request. Once she found programs that might have responsive documents, she sent a copy of the February FOIA request

---

actual FOIA request did not permit exclusion of State ERC documents, which he failed to produce.

to the EPA employees she thought might have documents and delivered a copy to a coordinator in each division.

The fallacy of the EPA's logic, however, is that it focuses on what the Tribe could have, or should have, reasonably requested – not on what the EPA should have reasonably found or produced in response to what was *actually sought* by the FOIA requests as written. The question of whether the Tribe's FOIA requests were reasonable as written was not before the trial court. Rather, the focus should have been on whether the EPA's interpretation of, and efforts to fulfill, those requests were reasonable and adequate. Here the undisputed evidence – highlighted by the EPA's own omission of critical language from the Tribe's request – demonstrates that the EPA's self-imposed limitations on its search were unreasonable and inaccurately depicted what the Tribe really sought. Indeed, the conclusion that it is entirely reasonable to exclude documents available to the public from a FOIA request comes dangerously close to taking on a legislative role – *i.e.*, establishing a new FOIA wholesale exemption for all public, or publicly available, documents that does not exist in the statute as one of the nine exemptions legislated by Congress. Moreover, the conclusion that it seems reasonable to exclude publicly available documents when responding to a FOIA

36

request begs the question. Unless a document falls into one of the nine recognized exemptions from disclosure under FOIA, it is due to be disclosed.[14]

Additional evidence before the district court also indicated that the EPA's limited "interpretation" of the June FOIA request was unreasonable in the Rule 56 record, but that evidence was not mentioned in the district court's summary judgment opinion. Apparently, after the June request was issued, the Tribe clarified its earlier instruction not to produce voluminous publicly available documents the Tribe already possessed. In fact, the Tribe and EPA agreed that only certain specifically-identified documents should be excluded as part of that category. Joette Lorion, the Tribal representative who actually participated in the conversation with the EPA (at that agency's request) regarding which documents could be excluded from production, filed an Affidavit in the district court stating that she never told the EPA it could exclude all publicly released or available documents. Lorion claimed that the only documents the Tribe agreed that the EPA did not have to produce were "voluminous" documents publicly available on the EPA web site, such as the EPA's Water Quality Standards Handbook. Lorion

_____

[14] As an aside, we question whether, in fact, most public agency documents are publicly available in one form or another. That alone would not excuse disclosure of the document. More importantly, Congress has not established such a blanket exclusion for documents in the public arena, and perhaps rightly so given the illogic of such an exclusion.

specifically disputed the testimony of EPA employees that suggested the Tribe's FOIA request did not seek State of Florida documents in the possession of the EPA. Lorion also disputed that the scientific documents the EPA admittedly failed to provide were "voluminous," were publicly available, or could be found on the EPA or State of Florida web sites.[15]

The district court's summary judgment analysis does not even mention the Lorion Affidavit or her denial that the Tribe told the EPA that it could exclude broad categories of documents. Moreover, the EPA's brief to this Court does not directly address the district court's omission of the Lorion Affidavit in its recitation of the evidence, nor does it challenge Lorion's statement that she met with EPA officials and specifically told them what publicly available documents to exclude. Rather, the EPA takes issue with Lorion's conclusion regarding which scientific documents were publicly available, maintaining that it was perfectly reasonable for the EPA to have excluded many of those documents.[16] These

_____

[15] The Tribe also notes that the testimony of Scheidt supports Lorion's conclusion that these scientific documents were not readily available EPA public documents. Scheidt testified that the hundreds of scientific documents that were responsive but not produced were not available on the EPA web site and required a subscription to scientific journals or, in some cases, contact with certain consultants to obtain.

[16] For example, the EPA maintains that it was reasonable for Scheidt to have assumed the Tribe's scientists had many of the documents he withheld given the fact that testimony from Scheidt and Mancusi-Ungaro indicated that the Tribe's representatives had been present with them in the public fora. Both Mancusi-Ungaro and Scheidt believed that those documents were

arguments simply do not diminish the effect of the Lorion affidavit on the Rule 56 record.

In addition to Lorion's Affidavit, there is Rule 56 record evidence indicating that the timing of the EPA's decision to exclude "publicly available" documents was somewhat dubious. The Tribe's supplemental request that mentioned, for the first time, the phrase "publicly available documents" was not submitted to the EPA until June 2004. Even assuming that the Tribe's "desire" was an instruction to the EPA not to produce documents in that category, that instruction undisputedly did not apply to the first February 2004 FOIA request. Thus, it makes no logical sense that all of the EPA deponents could have concluded "that the Tribe was not seeking publicly available documents at the time of the *February* and June FOIA requests." Because the "publicly available documents" language made its first appearance in June 2004, the EPA had no basis upon which to exclude publicly available documents of any kind from the February 2004 search. These facts not only demonstrate a disputed issue of

publicly available on the web or easily obtained from scientific sources. Additionally, Mancusi-Ungaro suggested that any failure to produce those documents was remedied by the production to the Tribe of scientific documents supporting the Phosphorus Rule during the latter part of 2004 as part of the litigation production of the EPA administrative record.

material fact, but also raise substantial concerns about the manner in which the EPA responded to the Tribe's requests.

We also question whether the EPA properly interpreted the Tribe's "desire" regarding voluminous publicly available documents in light of the need to "construe a FOIA request liberally." *Florida Immigrant Advocacy Ctr. v. National Security Agency*, 380 F. Supp. 2d 1332, 1345 (S.D. Fla. 2006) (quoting *LaCedra v. Executive Office for U.S. Attorneys*, 317 F.3d. 345, 348 (D.C. Cir. 2003)). Even if the EPA found the scope of the Tribe's June 3rd request to be ambiguous, it was obliged under FOIA to interpret both that request, and certainly the unambiguous February request before it, liberally in favor of disclosure. In light of this obligation, the EPA could not, consistent with its statutory responsibilities under FOIA, equate the Tribe's statement that it had "no desire [for the EPA] to produce voluminous publicly released documents *which we already have*" (emphasis added) with tacit permission to blanketly exclude from production "*all* publicly available documents" regardless of whether they were voluminous and regardless of whether the Tribe already had them. As the Tribe notes, there is a significant

difference between the omission of "voluminous publicly available documents that we already have" and disregarding any and all "publicly available documents."[17]

For all of these reasons, after a *de novo* review and under the circumstances presented here, we find that the EPA's self-imposed limitation to blanketly exclude all publicly available documents from its FOIA disclosures raises at least a material issue of fact.

### b. Whether the EPA's Supplemental Late Production of 160 Documents Was Reasonable

Next, the Tribe points to the 160 additional documents that were found after Dominy and Pearce had averred that all responsive documents had been produced or properly withheld under a FOIA exception as evidence that the search was inadequate. On two occasions after this litigation ensued, the EPA provided additional documents to the Tribe – 130 documents previously withheld from

---

[17] The EPA itself acknowledged that the elimination of all publicly available documents had a profound impact on the volume of records produced to the Tribe. Scheidt testified that he gave the Tribe a list of the publicly available documents used to determine its numeric criterion in 1999. Scheidt updated the list in 2001, and that 2001 list was provided in various public fora such as the ERC meetings. Scheidt completed a third list of such documents in January 2005 but that list was not responsive to the Tribe's FOIA because it post-dated the requests. Mancusi-Ungaro corroborated Scheidt's testimony regarding these lists of documents as either being already given to the Tribe or publicly available. Moreover, Mancusi-Ungaro testified that the vast majority of the 700 documents which were part of the EPA administrative record in support of the Tribe's numeric phosphorous criterion were produced electronically to the Tribe several months prior to his deposition. Mancusi-Ungaro was informed, as apparently were all the deponents, that the Tribe was not seeking publicly available documents at the time of the February and June FOIA requests. Pearce testified that if she had not eliminated duplicate documents, there would have been five to six boxes of documents produced.

production for a claimed privilege that the EPA later reconsidered[18] and thirty additional documents produced after Scheidt's deposition which included e-mail messages and copies of presentations in addition to handwritten notes.[19]

The Tribe notes both the significant number of supplemental documents (especially when compared to the two and one-half boxes initially provided) and the timing of the productions as indicative of the search's inadequacy. It is true that the first supplemental production of 130 documents occurred nearly twenty months after the Tribe's initial FOIA request, and almost five months after litigation ensued. Nonetheless, the Tribe has not specifically argued that any of the 130 documents (released at the discretion of the EPA OGC and Assistant Regional Administrator Wright) fail to qualify for a privilege. Instead, the Tribe asserts only generally that those documents "should" have been produced with the

---

[18] As explained by EPA Region 4 Assistant Regional Administrator Wright in his sworn Affidavit, out of 163 documents that he examined, the EPA upon reconsideration decided (after consultation with the OGC in Washington, D.C.) to release 12 documents in full and 118 documents in redacted part.

[19] The thirty additional documents from Scheidt's files consisted of personal notes on documents of public meetings of the State of Florida Environmental Regulation Committee (ERC), some notes and copies of public ERC presentations on which he made notes and some additional e-mail messages in his ERC files. Portions of the e-mails were redacted and the remaining documents were provided in their entirety on February 12, 2006. The redacted documents were subsequently produced to the district court for an *in camera* review, and the court found that they had been properly withheld under the deliberative process privilege and the attorney-client privilege.

EPA's initial disclosure, and focuses on the timing of the EPA's determination that the 130 documents are privileged.[20]

It is true, of course, that an agency generally has discretion to disclose exempt information if it sees fit to do so. *Chrysler Corp. v. Brown*, 441 U.S. 281, 293-94 (1979). The Tribe has not challenged the basis for that claim of exemption, but instead - ironically - criticizes the EPA for changing its mind about the claimed exemption at such a late date. This does not change the fact, however, that the decision to assert or withdraw a proper claim of exemption is solely within an agency's discretion.

With respect to his production of the thirty documents, Scheidt testified that he genuinely believed that the Tribe said it had "no desire to have EPA produce voluminous publicly released documents" and therefore, when the Tribe indicated in Scheidt's deposition that it was interested in his personal notes on public documents, mostly ERC public meeting handouts, Scheidt searched for them.

_____

[20] The Tribe notes that the EPA's initial privilege log of withheld documents, which was provided to the Tribe in August 2004 (shortly after the initial July 2004 document production), listed a total of only 29 privileged documents and therefore, based on simple mathematics, did not include the 130 documents at issue here. The Tribe's apparent suggestion is that because the 130 documents were not listed on the initial privilege log, the EPA must have fabricated their status as documents that could have been withheld as privileged when it later decided to produce them. The court reiterates, however, that the Tribe has not asserted that any one of the 130 documents would not have qualified for a privilege. Therefore, regardless of the timing of the EPA's pronouncement that a privilege could have been asserted for those documents, the Rule 56 record indicates that reconsideration by the EPA was the reason for their release.

Although the Tribe complains that the Scheidt supplemental production contained e-mails that were not personal notes, the EPA maintains that the fact that some *de minimus* number of documents were overlooked in the initial FOIA search does not prove that the search was in bad faith or inadequate.

This Circuit has not established a rule regarding the inference to be drawn from the late discovery and late release of additional documents responsive to a FOIA request. Relying on *Goland v. CIA*, 607 F.2d 339, 370 (D.C. Cir. 1978), the Tribe contends that the "'[d]iscovery of additional documents is more probative that the search was not thorough than if no other documents were found to exist.'" The Tribe further contends that a requestor may support an allegation of bad faith by presenting evidence that additional, reasonable documents exist. *See Ground Saucer Watch, Inc. v. CIA,* 692 F.2d 770, 771 (D.C. Cir. 1981). Citing a different case from a district court in the D.C. Circuit, the EPA casts a different light on the late document productions, theorizing that the further search and additional release are not an indication of the inadequacy of its search but further evidence of the agency's dedication to fully complying with its FOIA obligations. *See Western Center For Journalism v. I.R.S*, 116 F. Supp. 2d 1, 10 (D.D.C. 2000) (finding that an agency's release of additional responsive records mistakenly omitted from its initial response did not demonstrate bad faith since "it is unreasonable to expect

44

even the most exhaustive search to uncover every responsive file; what is expected of a law-abiding agency is that the agency admit and correct error when error is revealed"). The EPA also reiterates that FOIA requires an agency to conduct a reasonable search, but that search need not be perfect in order to be reasonable. *See Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986) ("[A] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request.").[21]

Thus, a valid question before this court is what inference, if any, can be or should be drawn from the late production or disclosure of FOIA documents. We are not certain that a "one size fits all" answer to that question exists. Rather than announcing that a certain inference can always be drawn from such a late production, we believe that the better course is to evaluate the reasoning behind the delay. In this case, because the EPA has offered a reasonable explanation for the late production of the two categories of documents in this case, the court finds that the district court did not err when it failed to draw any adverse interest against the EPA due to its late disclosure of the documents in question.

---

[21] In reaching its conclusion that the late disclosures in this case were not evidence of the search's inadequacy, the district court relied on *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard,* No.Civ.A. 04-1724*, 2006 WL 696053* at *8 (D.D.C. Mar. 20, 2006), which determined that "at most three documents identified by Plaintiff which could have reasonably been in [agency's] possession" was a "minor failure" in light of totality of the search results.

**B.    The Section 5 Privileges Claim**

Section 552(b)(5) exempts from FOIA disclosure any "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552 (b)(5). The statutory provision, known as Exemption 5, incorporates into FOIA the statutory and common law privileges normally available to a party in civil discovery. Here, the EPA withheld documents pursuant to the Section 5 Exemption in three categories of privilege – deliberative process, attorney-client, and attorney work product. Although privileged portions of documents may be withheld, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b) (sentence following the exemptions).[22]

Based upon FOIA's statutory language and Congressional intent, courts have expounded upon the level of information required from an agency to support its claimed privileges under Exemption 5. The D.C. Circuit[23] observed in *Vaughn*

---

[22] "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

[23] Because there are a number of federal government agencies located in Washington, D.C., it is not surprising that the majority of the caselaw interpreting FOIA has been decided by the D.C. Circuit.

*v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), that because the nature of FOIA "seriously distorts the traditional adversary nature of our legal system's form of dispute resolution," 484 F.2d at 824, the agency must give the requester of information "adequate specificity . . . to assur[e] proper justification by the governmental agency," *id*. at 827. The *Vaughn* decision marked the beginning of a tool (and in some Circuits, a requirement) that is widely referred to as the "*Vaughn* Index" – *i.e.*, a list containing the information claimed as exempt and the corresponding exemption under which it is claimed. The D.C. Circuit later clarified that a *Vaughn* Index required "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Central, Inc.*, 566 F.2d at 251; *see also Dellums v. Powell,* 642 F.2d 1351, 1361 (D.C. Cir. 1980).

This Circuit has held that in FOIA litigation, an agency has the burden of proving that it properly invoked any FOIA exemptions when it decided to withhold information. *Ely v. F.B.I.*, 781 F.2d 1487, 1489-90 (11th Cir. 1986). In reviewing a district court's finding of privilege for exemptions, we have two duties: we must determine (1) whether the district court had an adequate factual basis for the decision rendered; and (2) whether, upon this basis, the decision

47

reached was clearly erroneous. A trial court may utilize <u>alternate</u> methods by which to make the adequate factual basis determination: *in camera* review and the so-called *Vaughn* Index. Under the terms of the statute, the decision to conduct an *in camera* review of the documents and/or resort to the *Vaughn* Index is discretionary. *See N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978) (*in camera* review); 5 U.S.C. § 552(a)(4)(B) (*in camera* review); *Ely*, 781 F.2d at 1491 (*Vaughn* Index). In addition, the agency may rely on affidavits (in lieu of a *Vaughn* Index) to meet its burden so long as they provide an adequate factual basis for the district court to render a decision. *Miscavige v. I.R.S.*, 2 F.3d 366, 368 (11th Cir. 1993). Accordingly, in this Circuit, an adequate factual basis may be established, depending on the circumstances of the case, through affidavits, a *Vaughn* Index, *in camera* review, <u>or</u> through a combination of these methods. *Id.*

In accordance with *Ely*, our analysis of the district court's Section 5 rulings in this case begins first with the question of whether the court had before it sufficient evidence supporting the EPA's claimed exemptions to render a decision on the validity of those exemptions.

    1.    **Whether the Evidence Provided by the EPA Contained Sufficient Detail for the District Court to Make a Ruling on Summary Judgment**

The Tribe, relying principally on cases from the D.C. Circuit establishing exacting standards for the level of detail required in a *Vaughn* Index, asserts that the EPA failed to submit evidence supplying "relatively detailed justification[s for exempting documents], specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Mead Data Central*, 566 F.2d at 251. Crucial to our analysis of the Tribe's arguments is the appropriate standard for reviewing the factual support provided for the exemption under Section 5.

### a. Appropriate Standard for Determining the Level of Detail Required to Establish a Factual Basis for the Exemption

The Tribe asserts that "the requester and the trial judge must be able to derive from the index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure." *Campaign For Responsible Transplantation v. U.S. Food and Drug Admin.*, 180 F. Supp. 2d 29, 32 (D.D.C. 2001) (internal quotation marks and citation omitted). The Tribe urges this court to reject what it characterizes as the EPA's "only conclusory language that parrots the exemption" and instead adopt the D.C. Circuit's requirement of

> two factors that can assist the court in determining
> whether this [deliberative-process] privilege is available:

49

> "the nature of the decision making authority vested in the officer or person issuing the disputed document," and the relative positions in the agency's chain of command occupied by the document's author and recipient.

*Animal Legal Def. Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 300 (quoting *Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987) (internal quotation marks and citations omitted)). Moreover, specifically with respect to e-mails, the Tribe points to a decision of the Southern District of Florida which says that the agency must describe each e-mail, its author and recipient, and the e-mail contents withheld. *St. Andrews Park, Inc. v. U.S. Dep't of the Army Corps of Eng'rs*, 299 F. Supp. 2d 1264, 1271 (S.D. Fla. 2003).

In response to the Tribe's arguments, the EPA notes that, despite the wealth of caselaw from other courts on this issue, the appropriate standard of review in this case is supplied by the law of this Circuit (and not the D.C. Circuit). In the Eleventh Circuit, we have distilled the review of a district court's finding of privilege for exemptions into two levels: (1) determine whether the district court had an adequate factual basis for the decision rendered; and (2) whether, upon this basis, the decision reached was clearly erroneous. *Ely*, 781 F.2d at 1490. Despite the Tribe's reliance on the exacting standards of the D.C. Circuit, an adequate

factual basis can be established <u>in this Circuit</u> by affidavits alone, in lieu of a *Vaughn* Index or an *in camera* review. *See Miscavige*, 2 F.3d at 368 (holding that in certain cases, affidavits can be sufficient for summary judgment purposes in a FOIA case if they provide an accurate basis for a decision). Indeed, depending on the circumstances, an adequate factual basis may be provided through a singular method – such as affidavits, a *Vaughn* Index, or an *in camera* review, <u>or</u> a combination of these methods. *Miscavige*, 2 F.3d at 368. As the EPA notes, it is a rare case, however, where the government provides all three – affidavits, a *Vaughn* Index, and *in camera* review – as was done by the agency here.

The EPA criticizes the Tribe's attempt to <u>require</u> information regarding the role of each specific document in the decision-making process and the role of each sender and receiver in the decision-making process for the withheld documents, which were factors described as <u>helpful</u> to the district court in making its decision in *Animal Legal Defense Fund, Inc.*, 44 F. Supp. 2d at 300. An analysis of *Animal Legal Defense Fund, Inc.* reveals that nothing in that case indicates that all three factors should be required in every case where a deliberative process, attorney-client, or attorney work product privilege is claimed by an agency. In fact, in *Animal Legal Defense Fund, Inc.*, the Air Force had not provided one single description of any of the documents withheld. 44 F. Supp. 2d at 299.

51

Likewise, in *St. Andrews Park, Inc.*, the Southern District of Florida had no descriptive affidavit or *Vaughn* Index upon which to base its factual determination. 299 F. Supp. 2d at 1272. Thus, both of these cases, upon which the Tribe relies, lacked the elaborate statement of facts outlined in supporting affidavits, the detailed index entries, and the underlying documents themselves presented to the district court for *in camera* inspection – all of which were present in this case.

Based upon the applicable case law, it is readily apparent that the Tribe seeks to impose upon the EPA a burden of factual specificity that is not only <u>not part</u> of this Circuit's precedent, but that is <u>not even mandatory</u> according to the other courts that have opined that additional tools may be "helpful" to the court's analysis. Moreover, the Tribe has not pointed to a single case in which a district court looked to <u>three</u> independent factual sources supporting the claimed exemption (as was done here) but nonetheless rejected the agency's reliance on that privilege. Against this backdrop, the court turns to the Tribe's specific criticisms of the three methods utilized in this case.

### b. Adequacy of *Vaughn* Index and Affidavits Standing Alone[24]

---

[24] The Tribe further complains that the EPA did not submit anything resembling a *Vaughn* Index until more than one year after the EPA's initial production of documents responsive to the Tribe's FOIA requests. Although the EPA's FOIA response was allegedly complete as of July

The Tribe contends that the EPA's *Vaughn* Index and supporting affidavits are inadequate to establish a factual basis for the claimed exemptions because they fail to: (1) specifically note why each withheld or partially withheld document's release would have a "chilling effect" on the EPA's decision-making process; and (2) describe the role of each specific document in the decision-making process. Contrary to the Tribe's assertions, this Circuit has not established a set formula or pattern for what will suffice as a *Vaughn* Index. The index usually consists of a listing of each withheld document, or portion thereof, indicating the specific FOIA exemption applicable and the specific agency justification for the non-disclosure. *Vaughn*, 484 F.2d at 827.

The Tribe complains that the EPA's *Vaughn* Index and the accompanying affidavits also incorporate the same conclusory language as part of the explanation given for many of the documents withheld: "Release would have a chilling effect on the Agency's decision-making processes and cause public confusion about the reason for an Agency decision." The Tribe notes this general language provides no true explanation why withholding those documents would have a chilling effect or cause public confusion. Moreover, the Tribe argues that the documents are not

2004, the EPA waited until September 2005 to submit some semblance of a *Vaughn* Index in this case.

sufficiently described in either the *Vaughn* Index or in the accompanying affidavits and that the EPA never identifies the title or position of most of the authors and recipients of the withheld documents. For instance, many of the withholdings in the *Vaughn* Index refer only to "EPA Staff."

The EPA maintains their burden as to the index was satisfied, especially when the index is read in conjunction with the two affidavits offered in support thereof. Assistant Regional Administrator Wright's Affidavit states that documents 1 and 2 on the *Vaughn* Index, for example, are draft bills of the EFA, which reflect the back-and-forth discussions and mental impressions of the EPA staff. Those drafts include analysis of the EFA amendments and any policy implications for agency actions ongoing at the time of the documents' creation. Wright goes on to explain that the information contained in those documents was predecisional and deliberative as comments on possible approaches for the agency to consider regarding the EFA amendments. He notes that release of the documents would have a chilling effect on the agency's decision-making processes and would cause public confusion about the reason for the EPA's decision. Wright also asserts that no segregable information could be released without also revealing exempt information – *i.e.*, any factual information in the documents is inextricably intertwined with the exempt information.

From the *Vaughn* Index and supporting affidavits, it is fair to say that both the Tribe and the district court were able to understand why each document or portion of a document was withheld as exempt from disclosure, even without the *in camera* review. As noted by the district court in its January 17, 2006 order on the *in camera* viewing, the EPA did "an admirable and thorough job of disclosing as much information in the withheld documents as possible without waiving the privilege." However, in an effort to grant the Tribe the relief it sought regarding withheld documents, and in light of the Tribe's concerns that the *Vaughn* Index was not specific enough, the district court went even beyond the paperwork submitted and conducted a complete *in camera* review of the withheld documents to determine the applicability of the privileges.

### c. *In Camera* Review

The Tribe maintains that the district court's *in camera* review also was inadequate because, even *in camera,* the district court could not have had the necessary factual basis, or the appropriate context, to make its determination that the documents were properly withheld.

Pointing to the e-mail description requirements imposed by the Southern District of Florida in *St. Andrews Park, Inc.*, the Tribe avers that the absence of detail regarding the content, author, and recipient of each withheld e-mail rendered

the court's *in camera* review pointless.  In other words, the record is devoid of evidence that all of the documents lumped together as an e-mail chain were provided for *in camera* review and even if they were, the district court lacked the proper factual foundation to uphold the exemption.  Finally, the Tribe maintains that without a detailed description for each of the documents withheld, it was impossible for the district court to determine whether each section of documents was properly segregated.  For the reasons stated below, we reject the Tribe's arguments and find that the district court correctly found that the documents before it *in camera* were exempt from disclosure.

The principal problem with the Tribe's e-mail chain argument is that it assumes, on the one hand, that documents were missing from the chains submitted to the court, and, on the other hand, that even if all of the documents were before the district court, the court still lacked adequate information to rule on the exemptions.  The undisputed evidence indicates that neither of the Tribe's scenarios is accurate.  For example, as illustrated by document 102 (upon which the Tribe relies above), the court had more than an adequate basis for determining the propriety of the exemption. In addition to the *Vaughn* Index description[25] and

_____

[25] Document 102, cited by the Tribe in its brief is described in the *Vaughn* Index as follows:

Assistant Regional Administrator Wright's Affidavit explaining why document 102 was redacted, the district court received three separate documents in support of the exemption claimed for document 102 - a cover sheet that contained only the information listed on the *Vaughn* Index for document 102; a redacted copy of document 102 that was identical to the Tribe's redacted copy; and the unredacted copy of the full e-mail chain. The Tribe's argument that the district court lacked an adequate basis to determine whether the exemptions were appropriate is simply off the mark. The district court viewed everything that the EPA withheld from the Tribe and was able to determine that the actual substance of the documents matched the descriptions listed in the Wright Affidavit and *Vaughn* Index. When

---

Description [e-mail w/o attachment] e-mail chain discussing issues to be discussed at next EFA Workgroup meeting. Exemption 5 - deliberative process privilege - the e-mail provides an analysis of the EFA default criterion phosphorous rule challenge and legal and policy implications for certain agency action. The withheld information is predecisional and deliberative, because it comments on possible approaches for the agency to consider regarding the challenges. Policy evaluation related to the implementation of the EFA amendments was ongoing when this e-mail was written, the source lacked decisionmaking authority, and the e-mail contains variables to be considered in the Agency's policy analysis. Release would have a chilling effect on the Agency's decision-making processes and cause public confusion about the reason for an Agency decision. No other reasonably segregable information may be released without also revealing exempt information. Any factual information continuing to be withheld is inextricably intertwined with the exempt information. To the best of our knowledge, document has not been shared outside of the federal government or one of its contractors.

the supporting documentation is viewed as a whole, as the district court did, the reasons and support for the exemptions are readily established.[26]

### 2. Whether, Even If the District Court Had Sufficient Evidence to Make a Ruling on Summary Judgment, Summary Judgment Was Properly Granted as to the FOIA Exemptions Claimed by the EPA

Having determined that the district court had an adequate factual basis before it to judge the validity of the claimed exemptions, the court now turns to its analysis of the district court's decision to uphold the exemptions. The EPA's brief on appeal sets forth reasons why it withheld documents according to both the deliberative process, attorney-client, and attorney work product privileges pursuant to the Section 5 exemption.

There is no reason for this court to conclude that the district court erred when it upheld the EPA's assertion of the attorney-client privilege and the work-product privilege. The attorney-client privilege applies to "confidential communications between an attorney and his client relating to a legal matter for

---

[26] Finally, this court notes that it has conducted its own *in camera* review of the documents in question and has independently verified the district court's conclusions. This court undertook the extraordinary task of conducting a *de novo in camera* review of the documents <u>not</u> as a substitute for the district court's review but, in light of the Tribe's strenuous arguments in its briefs and at oral argument. Our review confirms that the district court correctly analyzed the exemption issue here. We emphasize that the panel has elected to exercise its discretion under the facts of <u>this</u> case and this case alone to conduct such a review, and we do not suggest that an appellate *in camera* review is appropriate in any other case.

which the client has sought professional advice." *Mead Data Central, Inc.*, 566

F.2d at 252. The Supreme Court has broadly construed this privilege in support of

the underlying policy "that sound legal advice or advocacy serves public ends and

that such advice or advocacy depends upon the lawyer's being fully informed by

the client." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981). The EPA states that it

withheld confidential communications between government attorneys and their

clients.

The attorney work product privilege generally protects documents prepared

by an attorney in anticipation of litigation. *See Hickman v. Taylor*, 329 U.S. 495,

509-10 (1947). Factual attorney work product enjoys sweeping exemption

protection because it is not "routinely" or "normally" discoverable through civil

discovery but likewise requires a showing of "substantial need" and "undue

hardship" by the party seeking discovery. *See F.T.C. v. Grolier, Inc*., 462 U.S. 19,

27-28 (1983). It is undisputed that some of the documents responsive to the

Tribe's requests were prepared by attorneys and analyzed the defensibility of

alternative courses of action under consideration by the EPA. To the extent that

those documents contained legal discussions and analyses prepared by an attorney

in anticipation of litigation, the documents or portions thereof were withheld

pursuant to FOIA exemption 5 as attorney work product.

Turning next to the issue of deliberative process, two requirements must be met for that privilege to apply. First, the material must be pre-decisional, *i.e.*, "prepared in order to assist an agency decision maker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Engineering Corp*., 421 U.S. 168, 184 (1975); *Nadler v. United States Dep't of Justice*, 955 F.2d 1479, 1490-91 (11th Cir. 1992). Second, it must be deliberative, "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1144; *Nadler*, 955 F.2d at 1490-91. The purpose of the deliberative process privilege is to protect the quality of the agency's decision-making process. Even factual material contained in a "deliberative" document may be withheld pursuant to the privilege where disclosure of the factual material would reveal the deliberative process or where the factual material is so inextricably intertwined with the deliberative material that meaningful segregation is not possible. *See Nadler*, 955 F.2d at 1490.

In opposition to summary judgment, the Tribe contended that many documents in the *Vaughn* Index bore the name of Scheidt (a scientist), and concerned either e-mail correspondence between Scheidt and technical consultants Bill Walker and Bob Kadlec, or Scheidt's dissemination of Walker and Kadlec's comments. The Tribe maintains that, in light of its arguments raised concerning

the improper withholding of scientific and technical material, summary judgment should not have been granted because the documents in the scientific or technical information category were not properly withheld nor properly segregated for the court to review.

The EPA responds that, as is indicated in the Wright and Brown affidavits and the *Vaughn* Index, the documents (both full and redacted versions) withheld pursuant to this privilege were pre-decisional and deliberative in nature. Many of those were draft documents including memoranda, issue papers, briefing papers, e-mails and other communications, that contained or incorporated comparisons, analyses, and evaluations of legal and policy considerations. Based upon the Wright and Brown affidavits and the *Vaughn* Index, distribution of these documents was internal – limited only to agency employees and contractors. The EPA emphatically maintains that release of any of those documents would have a chilling effect on the agency's decisionmaking process and would cause public confusion as to the reasons for agency decisions. The EPA avers that any non-exempt information contained within the documents which was reasonably segregable was released. Thus, with regard to the portions of three e-mails which were withheld in the EPA's supplemental response and about which the Tribe complains above, the EPA maintains that the redacted portions were protected

under the deliberative process privilege and/or the attorney-client privilege (as outlined in the Brown Affidavit).

The EPA provided the redacted portions of the three e-mails to the district court for *in camera* review, and the court held that the documents were properly exempt from disclosure. The district court found in its January 17, 2006 order:

> Upon review of the documents, the Court is able to conclude without reservation that each of the documents withheld by the EPA was done so properly and pursuant to an appropriate privilege – either the deliberative process privilege, the attorney-client privilege, or the work product doctrine. Indeed, the Court notes that the EPA did an admirable and thorough job of disclosing as much information in the withheld documents as possible without waiving a privilege. The Court is aware of the Plaintiff's concern that the Defendant has withheld scientific and technical factual documents under the guise of "deliberative process" or "attorney-client privilege" but based on its review of each document, this is not the case. Each document that the EPA withheld pursuant to the deliberative process privilege is pre-decisional and deliberative in nature. Furthermore, with respect to the applicability of the attorney-client privilege/work product doctrine, after reviewing the content of the documents that assert these privileges, the Court finds that the privileges were properly invoked.

Likewise, following the viewing of three redacted Scheidt documents, the district court held in March 2006: "Upon viewing these documents, once again, the Court finds that the Defendant acted properly in withholding portions of these e-mails pursuant to the deliberative process privilege and the attorney-client privilege. Defendant has explained its reasons for withholding portions of these three e-

62

mails in an affidavit attached to its Supplement to Motion for Summary

Judgment." We find no basis on which to reverse the district court's findings.

Finally, in what appears to be a new argument articulated for the first time

in its reply brief, the Tribe contends (relying on cases from the Ninth Circuit) that

the district court's lack of findings "stat[ing] in reasonable detail the reasons for

its decision as to each document in dispute" requires remand in this case. *Weiner*

*v. FBI*, 943 F.2d 972, 988 (9th Cir. 1991) (internal quotation marks and citation

omitted). The Tribe asserts that the district court's opinion fails to explain the

reasoning behind its rulings or delineate the specific exemption appropriate for

each withheld document, instead simply setting forth its belief that the EPA's

three claimed exemptions – the deliberative process privilege, the attorney-client

privilege, or the work product doctrine – were applicable.[27] The Tribe further

argues that because FOIA requires segregability and limits claims of exemption to

discrete units of information (so that to withhold an entire document all units must

fall within the statutory exemption 5 U.S.C. § 552 (b)), the district court's failure

to enunciate specific findings of segregability for each of the withheld documents

---

[27] In the D.C. Circuit, such a limited ruling from the district court may be found inadequate because it denies the appellate court an opportunity to conduct the requisite review and undermines the legislative mandate of FOIA. *See Founding Church of Scientology of Washington D.C., Inc. v. Bell*, 603 F.2d 945, 950 (D.C. Cir. 1979) (noting that district court's findings of fact and conclusions of law are required to be "sufficiently detailed to establish that the careful de novo review prescribed by Congress has in fact taken place.").

at the least requires remand so that the district court can make clear its findings as to whether any segregable portions of the withheld documents should have been disclosed. *Krikorian v. Department of State*, 984 F.2d 461, 467 (D.C. Cir. 1993)(It is reversible error not to make "specific findings of segregability regarding each of the withheld documents.").

Even if we were to consider the Tribe's eleventh hour argument regarding the inadequacy of the district court's findings in its order, the Tribe's contentions are, again, based on requirements established by other Circuits that have not been adopted by our court. In this Circuit, exacting requirements have not been placed on the district court's articulation of its reasons for sustaining a claim of exemption: Again, in the Eleventh Circuit, the review of a district court's finding of privilege for exemptions consists of two levels: (1) determine whether the district court had an adequate factual basis for the decision rendered; and (2) whether upon this basis the decision reached was clearly erroneous. *Ely v. F.B.I.*, 781 F.2d at 1490. In light of the *in camera* review by the district court (a review that we find was correctly conducted), this case does not present us with the appropriate occasion to consider whether to require additional levels of analysis and more detailed findings when reviewing a claim of privilege under FOIA.

For all these reasons, we find that contrary to the Tribe's arguments, the district court had more than an adequate basis to determine the propriety of the EPA's asserted privileges under Exemption 5 for the documents withheld. Just as there was extraordinary discovery in this case, there was extraordinary substantiation of the privileges. The EPA produced affidavits from Assistant Regional Administrator Wright and Assistant General Counsel Brown regarding the reasons for withholding documents. A detailed *Vaughn* Index was compiled, and at the Tribe's insistence, the district court conducted an *in camera* viewing of all of the withheld information. And while the Tribe insists that the district court should have compelled the EPA to describe the role of each specific document withheld in the decision making process, including the role of each author and recipient, the standard in this Circuit is whether the district court had an adequate basis to determine the exemption and whether this basis was clearly erroneous. Given the availability of affidavits and the *Vaughn* Index, combined with the *in camera* viewing, the district court had an adequate basis to determine the privileges asserted, and the Tribe has failed to demonstrate clear error in that decision.

## V.    CONCLUSION

For the reasons stated above, we vacate the district court's grant of summary judgment because genuine issues of material fact exist regarding the reasonableness and adequacy of the EPA search for, and disclosure of, responsive documents to the Tribe's 2004 FOIA request.  We affirm, however the district court's sustaining of the EPA's assertion of privileges and consequent withholding of responsive documents under FOIA Exemption 5.  We remand this case to the district court for further proceedings consistent with this opinion.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED**.